UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

                       Plaintiff,

           v.

PECHINEY PLASTIC PACKAGING, INC.,

                   Defendant.

Civil Action No. <u>09-cv-05692</u>

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

                       Plaintiff,

           v.

BRISTOL-MYERS SQUIBB COMPANY,
MYSET INVESTMENT COMPANY,
CITIGROUP, INC., MRC HOLDINGS, INC.,
REXAM BEVERAGE CAN COMPANY,
ALBÉA AMERICAS, INC., AND 191 STATE
HIGHWAY, ROUTE 31 NORTH, BLOCK 37,
LOTS 1 AND 2, BOROUGH OF WASHINGTON
AND BLOCK 30, LOT 17, WASHINGTON
TOWNSHIP, COUNTY OF WARREN,
NEW JERSEY,

                   Defendants.

Civil Action No. <u>13-cv-05798</u>

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>REMEDIAL DESIGN/REMEDIAL ACTION CONSENT DECREE</u>

## TABLE OF CONTENTS

I.      BACKGROUND ................................................................................................ 1
II.     JURISDICTION ............................................................................................... 4
III.    PARTIES BOUND ............................................................................................ 4
IV.     DEFINITIONS ................................................................................................. 5
V.      GENERAL PROVISIONS .............................................................................. 11
VI.     PERFORMANCE OF THE WORK BY PRIMARY SETTLING DEFENDANT ... 14
VII.    REMEDY REVIEW ...................................................................................... 26
VIII.   QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS .................. 26
IX.     ACCESS AND INSTITUTIONAL CONTROLS ............................................ 28
X.      REPORTING REQUIREMENTS .................................................................. 32
XI.     EPA APPROVAL OF PLANS, REPORTS, AND OTHER DELIVERABLES .... 33
XII.    PROJECT COORDINATORS ....................................................................... 34
XIII.   PERFORMANCE GUARANTEE ................................................................... 35
XIV.    CERTIFICATION OF COMPLETION .......................................................... 40
XV.     EMERGENCY RESPONSE ........................................................................... 44
XVI.    PAYMENTS .................................................................................................. 45
XVII.   INDEMNIFICATION AND INSURANCE ..................................................... 50
XVIII.  FORCE MAJEURE ....................................................................................... 52
XIX.    DISPUTE RESOLUTION ............................................................................. 53
XX.     STIPULATED PENALTIES ........................................................................... 56
XXI.    COVENANTS BY PLAINTIFF ..................................................................... 59
XXII.   COVENANTS BY SETTLING DEFENDANTS .............................................. 63
XXIII.  EFFECT OF SETTLEMENT; CONTRIBUTION ......................................... 65
XXIV.   LIEN RELEASE ............................................................................................ 66
XXV.    ACCESS TO INFORMATION ...................................................................... 66
XXVI.   RETENTION OF RECORDS ......................................................................... 67
XXVII.  NOTICES AND SUBMISSIONS ................................................................... 68
XXVIII. RETENTION OF JURISDICTION ............................................................... 72
XXIX.   APPENDICES ............................................................................................... 72
XXX.    COMMUNITY INVOLVEMENT ................................................................... 73
XXXI.   MODIFICATION .......................................................................................... 73
XXXII.  SUPPLEMENTAL ENVIRONMENTAL PROJECT ..................................... 73
XXXIII. LODGING AND OPPORTUNITY FOR PUBLIC COMMENT ...................... 76
XXXIV.  SIGNATORIES/SERVICE ............................................................................ 77
XXXV.   FINAL JUDGMENT ..................................................................................... 77

i

## I.    BACKGROUND

A.    The United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), filed two complaints, *United States v. Pechiney Plastic Packaging, Inc.*, 09-cv-05692 ("PPPI Complaint") and *United States v. Bristol Myers-Squibb Company, et al.*, 13-cv-05798 ("BMS Complaint"), in these related matters pursuant to Sections 107 and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607 and 9613.

B.    The United States in its complaints seeks reimbursement of costs incurred by EPA and the Department of Justice ("DOJ") for response actions at the Pohatcong Valley Groundwater Contamination Superfund Site ("Site") in Warren County, New Jersey, together with accrued interest and a declaratory judgment that Defendants are jointly and severally liable to the United States for further response costs.

C.    In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the State of New Jersey (the "State") on August 16, 2006 and October 28, 2009, as natural resource trustee, of negotiations with potentially responsible parties ("PRPs") regarding the implementation of the remedial design and remedial action at the Site, and EPA has provided the State with an opportunity to participate in such negotiations and be a party to a settlement.

D.    In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA notified the U.S. Fish and Wildlife Service, the National Oceanic and Atmospheric Administration, and the State's Office of Natural Resource Protection on August 16, 2006, April 16, 2008, and October 29, 2009 of negotiations with PRPs regarding the release of hazardous substances that may have resulted in injury to the natural resources under federal trusteeship and encouraged the trustees to participate in the negotiation of this Consent Decree.

E.    Primary Settling Defendant has admitted to certain liability as set forth in the Stipulation and Order dated January 6, 2014. Civ. 09-cv-05692, Docket Entry 100, attached hereto as Appendix G.  Except as set forth in Appendix G, Primary Settling Defendant does not admit to any liability to Plaintiff arising out of the transactions or occurrences alleged in the complaints, nor does it acknowledge that the release or threatened release of hazardous substances at or from the Site constitutes an imminent and substantial endangerment to public health or welfare or the environment.  Primary Settling Defendant neither admits nor denies violation of the September 28, 2007 Unilateral Administrative Order ("UAO"), CERCLA Docket Number 02-2007-2024. The Secondary Settling Defendants and Owner Settling Defendant do not admit any liability to Plaintiff arising out of the transactions or occurrences alleged in the complaints, nor do they acknowledge that the release or threatened release of hazardous substances at or from the Site constitutes an imminent and substantial endangerment to public health or welfare or the environment.

F.    It is expressly noted that (a) the United States has alleged that Bristol-Myers Squibb Company ("BMS") is responsible for the liabilities and obligations of Myset Investment Company ("Myset"); (b) BMS has denied that the claims asserted by the United States in this

action are enforceable against Myset; and (c) the United States and BMS seek to enter into this Consent Decree in order to settle and compromise all claims and defenses without waiving their respective positions set forth in (a) and (b) above; therefore, for purposes of this Consent Decree only and without waiver of its position set forth in (b) above, BMS signs this Consent Decree on BMS's behalf and on behalf of Myset to the extent, as the United States has alleged, any such claims are enforceable against Myset.

G.      Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, EPA placed the Site on the National Priorities List ("NPL"), set forth at 40 C.F.R. Part 300, Appendix B, on May 1, 1989, by publication in the Federal Register. (54 Fed. Reg. 13296-1, 13301, March 31, 1989).

H.      In response to a release or a substantial threat of a release of a hazardous substance at or from the Site, from 1985 to 1999 EPA and the State performed limited preliminary investigations to assess the extent and magnitude of the contamination and identify possible sources of contamination.

I.      The Site is approximately 10 miles long and approximately 1.5 miles wide and is defined by the extent of two plumes of groundwater contamination, one that is contaminated primarily with trichloroethylene ("TCE") ("TCE plume") and another that is contaminated primarily with tetrachloroethylene ("PCE") ("PCE plume"), that join into a combined plume. EPA separated the Site into three operable units ("OUs"). OU1 addresses contaminated groundwater within Washington Borough and parts of Washington and Franklin Townships; OU2 addresses groundwater contamination downgradient of OU1; and OU3 addresses contaminated soil source areas in the OU1 area.

J.      EPA completed a Remedial Investigation ("RI") Report for OU1 and a Feasibility Study ("FS") for OU1 in June 2005.

K.      Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice of the completion of the OU1 Proposed Plan for Remedial Action in July 2005. EPA provided an opportunity for written and oral comments from the public on the OU1 Proposed Plan for Remedial Action. A copy of the transcript of the public meeting is available to the public as part of the administrative record upon which the Regional Administrator, EPA Region 2, based the selection of the response action.

L.      The decision by EPA on the Remedial Action to be implemented at OU1 is embodied in the OU1 Record of Decision ("ROD"), executed on July 13, 2006, on which the State has given its concurrence. The OU1 ROD includes a responsiveness summary to the public comments. Notice of the final plan was published in accordance with Section 117(b) of CERCLA, 42 U.S.C. § 9617(b).

M.      Two separate remedial designs are underway to implement the OU1 ROD to address the TCE and PCE portions of the remedy in the OU1 Study Area, respectively. On September 28, 2007, EPA issued a UAO directing Defendant Pechiney Plastic Packaging, Inc. ("PPPI") to implement the OU1 ROD with respect to the TCE groundwater plume and the combined plume, including the Remedial Design, Remedial Action, Operation and Maintenance, Monitored Natural Attenuation, Institutional Controls, among other actions required under the

OU1 ROD, and excluding activities intended to remediate a specified portion of the PCE groundwater plume. EPA is currently designing the portion of the OU1 ROD remedy for the PCE plume in the OU1 Study Area.

N.    EPA continued to investigate OU2 groundwater contamination between 2006 and 2009, as part of the OU2 RI/FS. EPA completed an RI Report for OU2 and an FS for OU2 in April 2010.

O.    Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice of the completion of the OU2 Proposed Plan for Remedial Action in April 2010. EPA provided an opportunity for written and oral comments from the public on the OU2 Proposed Plan for Remedial Action. A copy of the transcript of the public meeting is available to the public as part of the administrative record upon which the Regional Administrator, EPA Region 2, based the selection of the response action.

P.    The decision by EPA on the Remedial Action to be implemented at OU2 is embodied in the OU2 ROD, executed on September 30, 2010, on which the State has given its concurrence. The OU2 ROD includes a responsiveness summary to the public comments. Notice of the final plan was published in accordance with Section 117(b) of CERCLA, 42 U.S.C. § 9617(b).

Q.    EPA is currently conducting RI/FS fieldwork for OU3. A ROD selecting the remedy for OU3 has not yet been issued.

R.    Primary Settling Defendant is currently implementing a removal action to address vapor intrusion at the Washington Facility, owned by Owner Settling Defendant.

S.    Trichloroethylene ("TCE") and other hazardous substances exist in the soil and groundwater beneath the Washington Facility.

T.    The two-story structure located on the Washington Facility is approximately 350,000 square feet in size. The ground floor consists of a production area, a former molding department located in the most southwestern portion of the facility, offices, a cafeteria, utility rooms, storage, warehousing, shop areas, and restrooms. The second floor of the facility houses administrative offices, storage areas, and restrooms.

U.    TCE is a volatile organic compound ("VOC") and can escape the soil and migrate upwards through the soil and through the foundation of buildings resulting in elevated TCE levels in the indoor air of such buildings, known as vapor intrusion.

V.    Based on the sampling and investigations conducted by EPA at the Washington Facility from March 2013 to July 2013, EPA identified elevated levels of TCE in the soil gas below the Washington Facility and in the indoor air of the Washington Facility. Sampling conducted on or around June 27 and June 28, 2013 indicated significantly elevated TCE levels in the indoor air throughout the Washington Facility.

W.      In July, 2013, Soil Vapor Extraction ("SVE") and Sub Slab Depressurization ("SSDS") systems were installed at the Washington Facility to address elevated levels of TCE found in the indoor air.

X.      The SVE system, including a backup SVE system for emergency use when the primary system is inoperable, and the SSDS have addressed indoor levels of TCE such that they are now below EPA's action level.

Y.      Based on the information presently available to EPA, EPA believes that the Work will be properly and promptly conducted by Primary Settling Defendant if conducted in accordance with the requirements of this Consent Decree and its appendices.

Z.      Solely for the purposes of Section 113(j) of CERCLA, 42 U.S.C. § 9613(j), the remedies set forth in the OU1 and OU2 RODs, the remedy to be set forth in the OU3 ROD, and the Work to be performed by Primary Settling Defendant shall constitute a response action taken or ordered by the President for which judicial review shall be limited to the administrative record.

AA.     The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and implementation of this Consent Decree will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II.      JURISDICTION

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b). This Court also has personal jurisdiction over Settling Defendants and Rio Tinto AUM (as defined herein). Solely for the purposes of this Consent Decree and the underlying complaints, Settling Defendants and Rio Tinto AUM waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District. Settling Defendants and Rio Tinto AUM shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

## III.      PARTIES BOUND

2.      This Consent Decree applies to and is binding upon the United States and upon Settling Defendants, their successors and assigns, and Rio Tinto AUM, and its successors and assigns. It is noted that this Consent Decree is binding upon Rio Tinto AUM with respect to only those obligations expressly set forth in the following provisions, which apply to Rio Tinto AUM, either specifically or as a "Party": Paragraphs 1, 2, 5, 11, 40, 42, 44, 45-49, 60, 68-71, 86, 89, 98, 99, 111, 125-126, and 128-132. Any change in ownership or corporate status of a Settling Defendant or Rio Tinto AUM including, but not limited to, any Transfer of assets or real

4

or personal property, shall in no way alter that entity's responsibilities under this Consent Decree.

3.     Primary Settling Defendant shall provide a copy of this Consent Decree to each contractor hired to perform the Work required by this Consent Decree and to each person representing the Primary Settling Defendant with respect to the Site or the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this Consent Decree.  Primary Settling Defendant or its contractors shall provide written notice of the Consent Decree to all subcontractors hired to perform any portion of the Work required by this Consent Decree.  Primary Settling Defendant shall nonetheless be responsible for ensuring that its contractors and subcontractors perform the Work in accordance with the terms of this Consent Decree.  With regard to the activities undertaken pursuant to this Consent Decree, each contractor and subcontractor shall be deemed to be in a contractual relationship with Primary Settling Defendant within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## IV.    DEFINITIONS

4.     Unless otherwise expressly provided in this Consent Decree, terms used in this Consent Decree that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations.  Whenever terms listed below are used in this Consent Decree or its appendices, the following definitions shall apply solely for purposes of this Consent Decree:

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

"Consent Decree" shall mean this Consent Decree and all appendices attached hereto (listed in Section XXIX).  In the event of conflict between this Consent Decree and any appendix, this Consent Decree shall control.

"Day" or "day" shall mean a calendar day unless expressly stated to be a working day.  The term "working day" shall mean a day other than a Saturday, Sunday, or federal holiday.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next working day.

"DOJ" shall mean the United States Department of Justice and its successor departments, agencies, or instrumentalities.

"Effective Date" shall mean the date upon which this Consent Decree is entered by the Court as recorded on the Court docket, or, if the Court instead issues an order approving the Consent Decree, the date such order is recorded on the Court docket.

"EPA" shall mean the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

5

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"NJDEP" or "State" shall mean the New Jersey Department of Environmental Protection and any successor departments or agencies of the State.

"Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing plans, reports, and other deliverables submitted pursuant to this Consent Decree, in overseeing implementation of the Work, or otherwise implementing, overseeing, or enforcing this Consent Decree, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to Paragraph 9 (Notice to Successors-in-Title and Transfers of Real Property), Sections VII (Remedy Review), IX (Access and Institutional Controls) (including, but not limited to, the cost of attorney time and any monies paid to secure access and/or to secure, implement, monitor, maintain, or enforce Institutional Controls including, but not limited to, the amount of just compensation), Paragraph 48 (Funding for Work Takeover), Section XV (Emergency Response), and Section XXX (Community Involvement). Future Response Costs shall also include all costs incurred or to be incurred by EPA for the OU2 RD, and costs incurred or to be incurred by EPA for performance of the RI and FS at OU3, but shall not include, (1) costs incurred or to be incurred by EPA for the OU1 PCE Remedial Design or for the construction, operation, and maintenance of the OU1 PCE Remedial Action, or for any vapor intrusion removal action related to the Park Hill Apartments, or for any other response actions (removal or remedial) that EPA may take or require others to undertake respecting the OU1 PCE plume; or (2) costs to be incurred for the performance of any portion or activities of the OU3 RD or RA that occur beyond the geographic boundaries of the Washington Facility, subject to the specific reservation set forth in Paragraph 87.a. Future Response Costs shall also include all Interim Response Costs, and all Interest on those Past Response Costs Settling Defendants have agreed to pay under this Consent Decree that has accrued pursuant to 42 U.S.C. § 9607(a) during the period from January 1, 2013 to the Effective Date, and Agency for Toxic Substances and Disease Registry ("ATSDR") costs regarding the Site.

"Institutional Controls" or "ICs" shall mean Proprietary Controls and state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices that: (a) limit land, water, and/or resource use to minimize the potential for human exposure to Waste Material at or in connection with the Site; (b) limit land, water, and/or resource use to implement, ensure non-interference with, or ensure the protectiveness of the Remedial Action; and/or (c) provide information intended to modify or guide human behavior at or in connection with the Site.

"Interim Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, (a) paid by the United States in connection with the Site between January 1, 2013 and the Effective Date, or (b) incurred prior to the Effective Date but paid after that date. Interim Response Costs shall not include any costs incurred or to be incurred by EPA for the OU1 PCE Remedial Design or for the construction, operation, and maintenance of the OU1 PCE Remedial Action, or for any vapor intrusion removal action related to the Park Hill Apartments, or for any

6

other response actions (removal or remedial) that EPA may take or require others to undertake respecting the OU1 PCE plume.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Operation and Maintenance" or "O&M" shall mean all activities required to maintain the effectiveness of the Remedial Actions as required under the Operation and Maintenance Plans approved or developed by EPA pursuant to Section VI (Performance of the Work by Primary Settling Defendant) and the SOWs.

"OU1 Record of Decision" or " OU1 ROD" shall mean the EPA Record of Decision relating to Operable Unit one, signed on July 13, 2006, by the Regional Administrator, EPA Region 2, or his/her delegate, and all attachments thereto. The OU1 ROD is attached hereto, in Appendix A.

"OU2 Record of Decision" or "OU2 ROD" shall mean the EPA ROD relating to Operable Unit two, signed on September 30, 2010, by the Regional Administrator, EPA Region 2, or his/her delegate, and all attachments thereto. The OU2 ROD is attached hereto, in Appendix A.

"OU3 Record of Decision" or "OU3 ROD" shall mean the EPA ROD relating to Operable Unit three, that, when issued after public comment, will be signed by the Regional Administrator of EPA Region 2, or his/her delegate, and all attachments thereto.

"Owner Settling Defendant" shall mean Albéa Americas, Inc.

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral or an upper or lower case letter.

"Parties" shall mean the United States, Settling Defendants, the Washington Facility and Rio Tinto AUM.

"Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States paid at or in connection with the Site through December 31, 2012, plus Interest on all such costs that has accrued pursuant to 42 U.S.C. § 9607(a) through such date.

"Performance Standards" shall mean the cleanup standards and other measures of achievement of the goals of the Remedial Action, set forth in the OU1 ROD, the OU2 ROD, and

to be set forth in the OU3 ROD, related SOWs, and any modified standards established pursuant to this Consent Decree.

"Plaintiff" shall mean the United States.

"Pohatcong Valley Groundwater Contamination Superfund Site Special Account" shall mean the special account, within the EPA Hazardous Substance Superfund, established for the Site by EPA pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3).

"Primary Settling Defendant" shall mean Pechiney Plastic Packaging, Inc. ("PPPI"); however, in the event of a Work Takeover, pursuant to Paragraph 89, Secondary Settling Defendants shall become jointly and severally liable for complying with all remaining obligations of "Primary Settling Defendant" under this Consent Decree.

"Proprietary Controls" shall mean easements or covenants running with the land that (a) limit land, water, or resource use and/or provide access rights and (b) are created pursuant to common law or statutory law by an instrument that is recorded by the owner in the appropriate land records office.

"RCRA" shall mean the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §§ 6901-6992k.

"Remedial Actions" shall mean activities Primary Settling Defendant is required to perform under the Consent Decree, including, but not limited to the following:

"OU1 Remedial Action" shall mean actions to implement the OU1 ROD in accordance with the OU1 UAO, the OU1 SOW, the final approved remedial design submissions for OU1, the approved OU1 Remedial Action Work Plans, and other plans approved by EPA, including implementation of Institutional Controls, until the OU1 Performance Standards are met, and excluding performance of the OU1 Remedial Design, OU1 O&M, the OU2 Remedial Design, OU2 Remedial Action, the OU3 Remedial Design, the OU3 Remedial Action, and the activities required under Section XXVI (Retention of Records). For purposes of this Consent Decree, OU1 Remedial Action shall not include the OU1 PCE Remedial Design or the construction, operation, and maintenance of the OU1 PCE Remedial Action, or any vapor intrusion removal action related to the Park Hill Apartments, or any other response actions (removal or remedial) that EPA may take or require others to undertake respecting the OU1 PCE plume.

"OU2 Remedial Action" shall mean actions to implement the OU2 ROD in accordance with the OU2 SOW, the final approved remedial design submissions for OU2, the approved OU2 Remedial Action Work Plans, and other plans approved by EPA, including implementation of Institutional Controls, until the OU2 Performance Standards are met, and excluding performance of the OU2 Remedial Design, OU2 O&M, the OU1 Remedial Design, the OU1 Remedial Action, the OU3 Remedial Design, the OU3 Remedial Action, and the activities required under Section XXVI (Retention of Records).

"OU3 Remedial Action" shall mean actions to implement the OU3 ROD, when issued by EPA in accordance with the final approved OU3 SOW, the final approved remedial design submissions for OU3, the approved OU3 Remedial Action Work Plans, and other plans approved by EPA, including implementation of Institutional Controls, until the OU3 Performance Standards are met, and excluding performance of the OU3 Remedial Design, OU3 O&M, the OU1 Remedial Design, the OU1 Remedial Action, the OU2 Remedial Design, the OU2 Remedial Action, and the activities required under Section XXVI (Retention of Records). Subject to the specific reservation set forth in paragraph 87.a, OU3 Remedial Action, for purposes of this Consent Decree, shall include activities intended to remediate that portion of OU3 that is located within the geographical boundaries of the Washington Facility, but shall not include activities solely intended to remediate that portion of OU3 that is not located within the geographical boundaries of the Washington Facility, as generally depicted on Map I of Appendix C1.

"Remedial Action Work Plans" shall mean the documents developed pursuant to Paragraph 10.d ("OU1 Remedial Action"), Paragraph 11.c ("OU2 Remedial Action") and Paragraph 12.d ("OU3 Remedial Action") and approved by EPA and any modifications thereto.

"Remedial Design" shall mean those activities to be undertaken to develop the final plans and specifications for the OU1 Remedial Action, the OU2 Remedial Action, and the OU3 Remedial Action pursuant to the Remedial Design Work Plans, including the OU1 Remedial Design, the OU2 Remedial Design, and the OU3 Remedial Design.

"Remedial Design Work Plans" shall mean the documents developed pursuant to Paragraph 10.c ("OU1 Remedial Design"), Paragraph 11.b ("OU2 Remedial Design"), and Paragraph 12.c ("OU3 Remedial Design") and approved by EPA, and any modifications thereto.

"Rio Tinto AUM" shall mean Rio Tinto AUM Company.

"Secondary Settling Defendant(s)" shall mean Albéa Americas, Inc., Bristol-Myers Squibb Company, Citigroup Inc., MRC Holdings, Inc. and Rexam Beverage Can Company.

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

"Settling Defendants" shall mean Albéa Americas, Inc., Bristol-Myers Squibb Company, Citigroup Inc., Myset Investment Company, MRC Holdings, Inc., Rexam Beverage Can Company, and PPPI.

"Site" shall mean the Pohatcong Valley Groundwater Contamination Superfund Site, encompassing an area approximately 10 miles long and approximately 1.5 miles wide and defined by the extent of two plumes of groundwater contamination, one that is contaminated primarily with TCE ("TCE plume") and another that is contaminated primarily with PCE ("PCE plume"), that join into a combined plume. The Site is located in portions of Washington Borough, Washington Township, Franklin Township and Greenwich Township in Warren County, New Jersey, and depicted generally on the map attached as Appendix C2.

"Standby Trust Agreement" shall mean the agreement that establishes the Standby Remedial Trust, in substantially the form attached as Appendix H.

"Standby Remedial Trust" shall mean the trust established pursuant to Section 3 of the Standby Trust Agreement attached hereto as Appendix H.

"State" shall mean the State of New Jersey.

"Statement of Work" or "SOW(s)" shall mean the statements of work for the implementation of the Remedial Designs and Remedial Actions, and the 2013 Vapor Intrusion Removal Action, made in accordance with this Consent Decree and shall include:

"OU1 Statement of Work" or "OU1 SOW" shall mean the statement of work for implementation of the OU1 Remedial Design, OU1 Remedial Action, and OU1 O&M at the Site, as set forth in Appendix B to this Consent Decree and any modifications made in accordance with this Consent Decree.

"OU2 Statement of Work" or "OU2 SOW" shall mean the statement of work for implementation of the OU2 Remedial Action, and OU2 O&M at the Site, as set forth in Appendix B to this Consent Decree and any modifications made in accordance with this Consent Decree.

"OU3 Statement of Work" or "OU3 SOW" shall mean the statement of work to be developed for implementation of the portion of the OU3 Remedial Design, OU3 Remedial Action, and OU3 O&M at the Site that is to occur within the geographical boundaries of the Washington Facility, as generally depicted on Map I, attached as Appendix C1, and any modifications made in accordance with this Consent Decree.

"2013 Vapor Intrusion Removal Action Statement of Work" or "Vapor Intrusion SOW" shall mean the statement of work for the implementation of the Vapor Intrusion Removal Action and O&M at the Washington Facility as set forth in Appendix B to this Consent Decree and any modifications made in accordance with this Consent Decree.

"Supervising Contractor" shall mean the principal contractors retained by Primary Settling Defendant to supervise and direct the implementation of the Work at each Operable Unit under this Consent Decree.

"Transfer" shall mean to sell, assign, convey, lease, or otherwise grant an ownership or leasehold interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any such interest by operation of law or otherwise, except that "Transfer" shall not refer to any action to sell, assign, grant or otherwise convey any stock or other equity interest in the Owner Settling Defendant itself or in any of its parent corporations or other affiliates.

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA, and any federal natural resource trustee.

"2013 Vapor Intrusion Removal Action" shall mean all activities and obligations comprising the removal action Primary Settling Defendant has undertaken and is required to perform pursuant to the Vapor Intrusion SOW attached in Appendix B to this Consent Decree.

"Washington Facility" shall mean all land and improvements found at 191 State Highway, Route 31 North, Block 37, Lots 1 and 2 on the tax map of Washington Borough and Block 30, Lot 17 on the tax map of Washington Township, County of Warren, New Jersey.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (4) any "hazardous material" under the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 *et seq.*.

"Work" shall mean all activities and obligations Primary Settling Defendant is required to perform under this Consent Decree, except the activities required under Section XXVI (Retention of Records), including but not limited to:

"OU1 Work" shall mean all activities and obligations Primary Settling Defendant is required to perform relating to OU1 under this Consent Decree.

"OU2 Work" shall mean all activities and obligations Primary Settling Defendant is required to perform relating to OU2 under this Consent Decree.

"OU3 Work" shall mean all activities and obligations Primary Settling Defendant is required to perform relating to OU3 under this Consent Decree.

"2013 Vapor Intrusion Work" shall mean all activities and obligations Primary Settling Defendant is required to perform relating to the 2013 Vapor Intrusion Removal Action at the Washington Facility.

"Work Takeover" shall mean the process set forth in Paragraph 89, by which EPA may either assume performance of all or a portion of the Work or direct Secondary Settling Defendants to assume performance of all or a portion of the Work.

## V.    GENERAL PROVISIONS

5.      Objectives of the Parties. The objectives of the Parties in entering into this Consent Decree are to protect public health or welfare or the environment by the design and implementation of response actions at the Site by Plaintiff and Primary Settling Defendant, to pay response costs of the Plaintiff, and to resolve the claims of Plaintiff against Settling Defendants as provided in this Consent Decree.

6.      Commitments by Settling Defendants.

a.      Primary Settling Defendant shall finance and perform the Work in accordance with this Consent Decree, the OU1 ROD, the OU1 SOW, the OU2 ROD, the OU2

SOW, the OU3 ROD, the OU3 SOW, the 2013 Vapor Intrusion SOW and all work plans and other plans, standards, specifications, and schedules set forth in this Consent Decree or developed by Primary Settling Defendant and approved by EPA pursuant to this Consent Decree. Primary Settling Defendant and Secondary Settling Defendants shall pay the United States for Past Response Costs as provided in this Consent Decree. Primary Settling Defendant shall pay the United States for Future Response Costs as provided in this Consent Decree.

      b.      In the event of a Work Takeover, pursuant to Paragraph 89, Secondary Settling Defendants shall become jointly and severally liable for complying with all remaining obligations of "Primary Settling Defendant" under this Consent Decree including, subject to the requirements of Paragraph 89, obligations to finance and perform the Work and pay amounts due (other than certain penalties imposed on Primary Settling Defendant, as set forth in Section XX). Nothing in this paragraph shall be construed to relieve Primary Settling Defendant of any of its obligations under this Consent Decree.

      7.    <u>Compliance With Applicable Law</u>. All activities undertaken by Primary Settling Defendant pursuant to this Consent Decree shall be performed in accordance with the requirements of all applicable federal, state, and local laws and regulations. Primary Settling Defendant must also comply with all applicable or relevant and appropriate requirements of all federal, state, and local environmental laws as set forth in the OU1 ROD, the OU1 SOW, the OU2 ROD, the OU2 SOW, and to be set forth in the OU3 ROD and the OU3 SOW. The activities conducted pursuant to this Consent Decree, if approved by EPA, shall be deemed to be consistent with the NCP.

      8.    <u>Permits</u>.

      a.      As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, Primary Settling Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

      b.      Primary Settling Defendant may seek relief under the provisions of Section XVIII (Force Majeure) for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval referenced in Paragraph 8.a and required for the Work, provided that it has submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

      c.      This Consent Decree is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

      9.    <u>Notice to Successors-in-Title and Transfers of Real Property</u>.

      a.      For any real property owned by Owner Settling Defendant located at the Washington Facility, Owner Settling Defendant shall, within 30 days after the Effective Date,

submit to EPA for approval, a notice that provides a description of the real property and provides notice to all successors-in-title that the real property is part of the Site, that EPA has selected a remedy for OU1 and OU2, intends to select a remedy for OU3, and that potentially responsible parties have entered into a Consent Decree requiring implementation of the remedies, as described herein. The notice shall identify the United States District Court in which the Consent Decree was filed, the name and civil action numbers of these cases, and the date the Consent Decree was entered by the Court. Owner Settling Defendant shall record the notice with the appropriate land records office within ten days after EPA's approval of the notice. Owner Settling Defendant shall provide EPA with a certified copy of the recorded notice within 30 days after recording such notice. Owner Settling Defendant shall amend the notice, pursuant to a written request by EPA under Paragraph 25, to incorporate groundwater and land use restrictions presently identified or to be identified, in substantially the form set forth in Appendix D.

b. Owner Settling Defendant shall, at least 30 days prior to any Transfer by Owner Settling Defendant of any ownership or leasehold interest in real property located at the Site, give written notice: (1) to the transferee regarding the Consent Decree and any Institutional Controls regarding the real property; and (2) to EPA and the State regarding the proposed Transfer, including the name and address of the transferee and the date on which the transferee was notified of the Consent Decree and any Institutional Controls.

c. Owner Settling Defendant may Transfer any ownership or leasehold interest in real property located at the Site only if: (1) the notice required in Paragraph 9.a above, or any Proprietary Controls required by Paragraph 25.c, as further defined in Appendix D, have been recorded with respect to the real property; or (2) Owner Settling Defendant has obtained an agreement from the transferee, enforceable by Settling Defendants and the United States, to (i) allow access and restrict land/water use, pursuant to Paragraphs 26.a(1) and 26.a(2), (ii) record any Proprietary Controls on the real property, pursuant to Paragraph 26.a(3), and (iii) subordinate its rights to any such Proprietary Controls, pursuant to Paragraph 26.a(3), and EPA has approved the agreement in writing. If, after a Transfer of the real property, the transferee fails to comply with the agreement provided for in this Paragraph 9.c, Owner Settling Defendant shall take all reasonable steps to obtain the transferee's compliance with such agreement. The United States may seek the transferee's compliance with the agreement and/or assist Owner Settling Defendant in obtaining compliance with the agreement. Primary Settling Defendant shall reimburse the United States under Section XVI (Payments), for all costs incurred, direct or indirect, by the United States regarding obtaining compliance with such agreement, including, but not limited to, the cost of attorney time.

d. In the event of any Transfer of ownership or leasehold interest in real property located at the Site by the Owner Settling Defendant, unless the United States otherwise consents in writing, Primary Settling Defendant and the new Owner Settling Defendant (and to the extent applicable, the other Secondary Settling Defendants) shall continue to comply with their obligations under the Consent Decree, including, but not limited to, their obligation to provide and/or secure access, to implement, maintain, monitor, and report on Institutional Controls, and to abide by such Institutional Controls.

## VI.    PERFORMANCE OF THE WORK BY PRIMARY SETTLING DEFENDANT

10.    <u>Performance of the OU1 Work.</u>

a.    Selection of Supervising Contractor for OU1 Work.

(1)    All aspects of the OU1 Work to be performed by Primary Settling Defendant pursuant to Sections VI (Performance of the Work by Primary Settling Defendant), VIII (Quality Assurance, Sampling, and Data Analysis), IX (Access and Institutional Controls), and XV (Emergency Response) shall be under the direction and supervision of the Supervising Contractor for OU1. EPA has approved of Environ International Corporation as the Primary Settling Defendant's Supervising Contractor for the OU1 Work. If at any time hereafter, Primary Settling Defendant proposes to change this Supervising Contractor for OU1, Primary Settling Defendant shall notify EPA and NJDEP within 10 days, in writing, of the names, titles, and qualifications of the new Supervising Contractor before the new Supervising Contractor for OU1 performs, directs, or supervises any Work under this Consent Decree. Primary Settling Defendant shall demonstrate that the proposed replacement contractor has a quality assurance system that complies with the Uniform Federal Policy for Implementing Quality Systems (UFP-QS), (EPA/505/F-03/001, March 2005), by submitting a copy of the proposed contractor's Quality Management Plan ("QMP").

(2)    If EPA disapproves a replacement Supervising Contractor for OU1, EPA will notify Primary Settling Defendant in writing. Primary Settling Defendant shall submit to EPA a list of contractors, including the qualifications of each contractor, within 30 days after receipt of EPA's disapproval of the contractor previously proposed. EPA will provide written notice of the names of any contractor(s) that it disapproves and an authorization to proceed with respect to any of the other contractors. Primary Settling Defendant may select any contractor from that list that is not disapproved and shall notify EPA of the name of the contractor selected within 21 days after EPA's authorization to proceed.

(3)    If EPA fails to provide written notice of its authorization to proceed or disapproval as provided in this Paragraph and this failure prevents Primary Settling Defendant from meeting one or more deadlines in a plan approved by EPA pursuant to this Consent Decree, Primary Settling Defendant may seek relief under Section XVIII (Force Majeure).

b.    Primary Settling Defendant shall perform the activities required under the OU1 UAO as set forth in this Paragraph. This Consent Decree shall supersede the OU1 UAO.

c.    OU1 Remedial Design.

(1)    Primary Settling Defendant has submitted and EPA has approved a Final Remedial Design Work Plan. Primary Settling Defendant shall perform the Remedial Design in conformance with the Final Remedial Design Work Plan and within the time frames specified in the schedule attached as Appendix E. The Final

Remedial Design Work Plan was prepared in accordance with the requirements of the OU1 SOW.

(2)  Within forty five (45) days of the completion of injection testing of the newly installed injection wells (i.e., POHIW3 and POHIW4 located at the Washington facility),  the Primary Settling Defendant shall submit a revised Field Sampling and Analysis Report (FSAR) to EPA for review and approval pursuant to Section XI (EPA Approval of Plans, Reports, and Other Deliverables) of the Consent Decree.

(3)  Primary Settling Defendant shall submit all Remedial Design Reports in accordance with the requirements and schedule set forth in the OU1 SOW. EPA has reviewed and commented on the Intermediate Design Report (65% Completion) and Primary Settling Defendant shall make those changes required by EPA's comments in the Pre-Final Remedial Design Report (95% Completion) in accordance with the schedule set forth in the OU1 SOW.

(4)  Primary Settling Defendant shall submit the Final Remedial Design Report (100% Completion) to EPA for review and approval pursuant to Section XI (EPA Approval of Plans, Reports, and Other Deliverables).

(5)  Primary Settling Defendant has implemented the MNA Sampling Plan that was approved by EPA, and will continue such implementation after lodging of this Consent Decree.

d.  OU1 Remedial Action.

(1)  Within 45 days after EPA approval of the Final Remedial Design Report (100% Completion), Primary Settling Defendant shall submit to EPA and the State a work plan for the performance of the OU1 Remedial Action at the Site ("OU1 Remedial Action Work Plan") in accordance with the OU1 SOW. The draft Remedial Action Work Plan shall include, but not be limited to, the requirements set forth in Section XI of the OU1 SOW.

(2)  Within 30 days after the approval of the OU1 Remedial Action Work Plan by EPA, Primary Settling Defendant shall initiate remedial construction of the OU1 Remedial Action pursuant to and in accordance with the OU1 Final Remedial Design Report (100% Completion), the OU1 Remedial Action Work Plan, the OU1 SOW, the schedule set forth in Appendix E and this Consent Decree.  Primary Settling Defendant shall submit to EPA and the State all reports and other deliverables required under the approved OU1 Remedial Action Work Plan in accordance with the approved schedule for review and approval pursuant to Section XI (EPA Approval of Plans, Reports, and Other Deliverables).  Unless otherwise directed by EPA, Primary Settling Defendant shall not commence remedial construction of the OU1 Remedial Action prior to EPA approval of the OU1 Remedial Action Work Plan.

(3)    Primary Settling Defendant shall continue to implement the OU1 Remedial Action until the Performance Standards set forth in the OU1 ROD are achieved unless EPA approves of a waiver in accordance with the OU1 SOW. Primary Settling Defendant shall implement O&M for as long thereafter as is required by this Consent Decree and the OU1 SOW.

(4)    If, based on the results of the groundwater monitoring, EPA believes that one or more of the Performance Standards specified in the OU1 ROD will not be reached in a reasonable time period, EPA may require Primary Settling Defendant to implement contingency measures, which may include Alternative Remedial Strategies, and to submit a Contingency Measures plan in accordance with Section XIII of the OU1 SOW.

(5)    Primary Settling Defendant shall submit a draft OU1 Remedial Action Report to EPA for review and approval pursuant to Section XI, within 90 days of EPA's determination that construction is complete. The draft OU1 Remedial Action Report shall be prepared in accordance with the OU1 ROD and the OU1 SOW. The draft Remedial Action Report shall include, but not be limited to, the requirements set forth in Section XII.C. of the OU1 SOW. Following EPA approval, the draft OU1 Remedial Action Report shall become the OU1 Remedial Action Report.

e.    In accordance with Section XIV.A of the OU1 SOW, Primary Settling Defendant shall submit a Post-Remediation Monitoring ("PRM") Plan to EPA for review and approval. The PRM Plan shall include, at a minimum, the requirements set forth in Section XIV.A of the OU1 SOW. Primary Settling Defendant shall implement the PRM program and other related activities in accordance with the schedule set forth in the OU1 SOW.

f.    Modification of OU1 SOW or Related Work Plans.

(1)    EPA may determine that, in addition to the OU1 Work required under this Consent Decree, additional response activities may be necessary to protect human health and the environment. If EPA determines that additional response activities are necessary, EPA may require Primary Settling Defendant to submit a work plan for additional response activities. EPA may also require Primary Settling Defendant to modify any plan, design, or other deliverable required under this Consent Decree relating to OU1, including any approved modifications.

(2)    Not later than thirty (30) days after receiving EPA's notice that additional response activities are required, Primary Settling Defendant shall submit a work plan for the response activities to EPA for review and approval pursuant to Section XI. Upon approval by EPA of the work plan, Primary Settling Defendant shall implement the work plan according to the standards, specifications and schedule in the approved work plan. Primary Settling Defendant shall notify EPA of its intent to perform such additional response activities within seven (7) days after receipt of EPA's request for additional response activities.

11.   Performance of the OU2 Work.

    a.    OU2 Project Coordinator.

        (1)   All aspects of the OU2 Work to be performed by Primary Settling Defendant pursuant to Section VI (Performance of the Work by Primary Settling Defendant) and described in the OU2 SOW, and other applicable provisions of this Consent Decree shall be performed under the direction and supervision of Rio Tinto AUM and a qualified licensed professional engineering firm subject to EPA's approval. Rio Tinto AUM shall be solely and directly responsible for all community relations aspects and interaction with the public including the affected property owners. Rio Tinto AUM may utilize the services of a contractor for technical support and specifically ENVIRON International Corporation for technical aspects of the OU2 Work to be performed by Primary Settling Defendant and/or may submit single deliverables to address Site-wide issues such as monitored natural attenuation (MNA), classification exception area (CEA) and vapor intrusion (VI) that are covered by multiple SOWs, provided Primary Settling Defendant clearly identifies which requirements the deliverable is intended to satisfy.  All technical work shall be performed under the supervision of, and signed/certified by, a licensed New Jersey professional engineer.  If at any time hereafter, Primary Settling Defendant proposes to change this Project Coordinator for OU2, Primary Settling Defendant shall give such notice to EPA and must obtain an authorization to proceed from EPA before the new Project Coordinator for OU2 performs, directs, or supervises any Work under this Consent Decree.  Primary Settling Defendant shall demonstrate that the proposed replacement Project Coordinator has a quality assurance system that complies with the Uniform Federal Policy for Implementing Quality Systems (UFP-QS), (EPA/505/F-03/001, March 2005), by submitting a copy of the proposed Project Coordinator's QMP.

        (2)   If EPA disapproves a replacement Project Coordinator for OU2, EPA will notify Primary Settling Defendant in writing.  Primary Settling Defendant shall submit to EPA a list of Project Coordinators, including the qualifications of each Project Coordinator that would be acceptable to it within 30 days after receipt of EPA's disapproval of the Project Coordinator previously proposed.  EPA will provide written notice of the names of any  Project Coordinator(s) that it disapproves and an authorization to proceed with respect to any of the other Project Coordinators. Primary Settling Defendant may select any Project Coordinator from that list that is not disapproved and shall notify EPA of the name of the Project Coordinator selected within 21 days after EPA's authorization to proceed.

        (3)   If EPA fails to provide written notice of its authorization to proceed or disapproval as provided in this Paragraph and this failure prevents Primary Settling Defendant from meeting one or more deadlines in a plan approved by EPA pursuant to this Consent Decree, Primary Settling Defendant may seek relief under Section XVIII (Force Majeure).

    b.    OU2 Remedial Design.

(1)    The Remedial Design of OU2 will be completed by EPA.  After EPA finalizes the 60 percent Remedial Design, or after the Date of Lodging, whichever is first, EPA will invite Primary Settling Defendant and its representatives to participate in significant technical meetings, conference calls, and community involvement activities, at EPA's discretion, in order to facilitate efficient and cost effective transition of implementation of the Remedial Action to Primary Settling Defendant.  EPA will also provide Primary Settling Defendant status updates regarding the OU2 RD and will offer meetings, at EPA's discretion, to discuss questions (regarding technical information and community involvement concerns) that Primary Settling Defendant may have regarding the OU2 RD.

c.    OU2 Remedial Action.

(1)    Within 60 days after notification of EPA's completion of the OU2 Final Remedial Design Report, Primary Settling Defendant shall submit to EPA and the State a work plan for the performance of the OU2 Remedial Action at the Site ("OU2 Remedial Action Work Plan") in accordance with the OU2 SOW.  Upon its approval by EPA, the OU2 Remedial Action Work Plan shall be incorporated into and enforceable under this Consent Decree.  Upon approval of the OU2 Remedial Action Work Plan by EPA, after a reasonable opportunity for review and comment by the State, Primary Settling Defendant shall implement the activities required under the OU2 Remedial Action Work Plan.  Primary Settling Defendant shall submit to EPA and the State all reports and other deliverables required under the approved OU2 Remedial Action Work Plan in accordance with the approved schedule for review and approval pursuant to Section XI (EPA Approval of Plans, Reports, and Other Deliverables).  Unless otherwise directed by EPA, Primary Settling Defendant shall not commence physical OU2 Remedial Action activities at the Site prior to approval of the OU2 Remedial Action Work Plan and EPA's Notice to Proceed.

d.    Primary Settling Defendant shall continue to implement the OU2 Remedial Action until the Performance Standards are achieved unless EPA agrees to a waiver in accordance with the OU2 SOW.  Primary Settling Defendant shall implement O&M for as long thereafter as is required by this Consent Decree and the OU2 SOW.

e.    Modification of OU2 SOW or Related Work Plans.

(1)    If EPA determines that it is necessary to modify the work specified in the OU2 SOW and/or in work plans developed pursuant to the OU2 SOW to achieve and maintain the Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the OU2 ROD, and such modification is consistent with the scope of the remedy set forth in the OU2 ROD, then EPA may issue such modification in writing and shall notify Primary Settling Defendant of such modification.  For the purposes of this Paragraph, Paragraphs 50.b (Completion of the OU2 Remedial Action) and 51 (Completion of the Work) only, the "scope of the remedy set forth in the ROD" is the: (i) provision of potable water to impacted and threatened properties through the construction of a water line and connections; (ii)

18

monitored natural attenuation for the remediation of groundwater contamination in the OU2 Study Area until cleanup goals are met; (iii) the establishment of a CEA, which is an institutional control, to minimize the potential for exposure to contaminated groundwater until the aquifer meets the cleanup goals; and (iv) the abandonment of private potable wells. If Primary Settling Defendant objects to the modification it may, within 30 days after EPA's notification, seek dispute resolution under Paragraph 70 (Record Review).

(2)     The OU2 SOW and/or related work plans shall be modified: (1) in accordance with the modification issued by EPA; or (2) if Primary Settling Defendant invokes dispute resolution, in accordance with the final resolution of the dispute. The modification shall be incorporated into and enforceable under this Consent Decree, and Primary Settling Defendant shall implement all work required by such modification. Primary Settling Defendant shall incorporate the modification into the Remedial Design or Remedial Action Work Plan under Paragraph 11.b (OU2 Remedial Design) or Paragraph 11.c (OU2 Remedial Action), as appropriate.

(3)     Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this Consent Decree.

12.     Performance of the OU3 Work.

a.     Selection of Supervising Contractor for OU3 Work.

(1)     All aspects of the OU3 Work to be performed by Primary Settling Defendant pursuant to Sections VI (Performance of the Work by Primary Settling Defendant), VII (Remedy Review), VIII (Quality Assurance, Sampling, and Data Analysis), IX (Access and Institutional Controls), and XV (Emergency Response) shall be under the direction and supervision of the Supervising Contractor for OU3, the selection of which shall be subject to disapproval by EPA. Within 30 days after the issuance of the OU3 ROD, Primary Settling Defendant shall notify EPA in writing of the name, title, and qualifications of any contractor proposed to be the Supervising Contractor for OU3. With respect to any contractor proposed to be Supervising Contractor for OU3, Primary Settling Defendant shall demonstrate that the proposed contractor has a quality assurance system that complies with the Uniform Federal Policy for Implementing Quality Systems (UFP-QS), (EPA/505/F-03/001, March 2005), by submitting a copy of the proposed contractor's QMP. EPA will issue a notice of disapproval or an authorization to proceed regarding hiring of the proposed contractor. If at any time thereafter, Primary Settling Defendant proposes to change a Supervising Contractor for OU3, Primary Settling Defendant shall give such notice to EPA and must obtain an authorization to proceed from EPA before the new Supervising Contractor performs, directs, or supervises any Work under this Consent Decree.

(2)     If EPA disapproves a proposed Supervising Contractor for OU3, EPA will notify Primary Settling Defendant in writing. Primary Settling Defendant

shall submit to EPA a list of contractors, including the qualifications of each contractor, that would be acceptable to it within 30 days after receipt of EPA's disapproval of the contractor previously proposed. EPA will provide written notice of the names of any contractor(s) that it disapproves and an authorization to proceed with respect to any of the other contractors. Primary Settling Defendant may select any contractor from that list that is not disapproved and shall notify EPA of the name of the contractor selected within 21 days after EPA's authorization to proceed.

      (3)    If EPA fails to provide written notice of its authorization to proceed or disapproval as provided in this Paragraph and this failure prevents Primary Settling Defendant from meeting one or more deadlines in a plan approved by EPA pursuant to this Consent Decree, Primary Settling Defendant may seek relief under Section XVIII (Force Majeure).

    b.      OU3 Statement of Work.

      (1)    EPA will complete the OU3 Remedial Investigation/Feasibility Study (RI/FS), OU3 proposed plan, and OU3 ROD. In accordance with Section IX (Access and Institutional Controls) of this Consent Decree, Owner Settling Defendant will allow EPA and its contractors to access the Washington Facility for the purpose of performing all OU3 RI/FS activities. EPA will coordinate with Primary Settling Defendant and Owner Settling Defendant on any further sampling at the Washington Facility that EPA undertakes to complete the OU3 Remedial Investigation in an effort to minimize adverse impacts on plant operations and the ongoing vapor intrusion removal activities. EPA will share validated data from such sampling with Primary Settling Defendant and Owner Settling Defendant.

      (2)    In accordance with standard public comment provisions set forth in the NCP, Settling Defendants are entitled to submit comments on the OU3 Proposed Plan, through the public comment process. During the public comment period, EPA will offer meetings to Settling Defendants and other members of the public, at EPA's discretion, to discuss the remedial options being considered for the OU3 ROD.

      (3)    Within 45 days after EPA's issuance of an authorization to proceed pursuant to Paragraph 12.a (Selection of Supervising Contractor for OU3 Work), Primary Settling Defendant shall submit to EPA a draft OU3 SOW for the portion of the remedy set forth in the OU3 ROD that is to occur within the geographical boundaries of the Washington Facility, as generally depicted on Map I, attached as Appendix C1, for achievement of the Performance Standards and other requirements related to the above described area, as set forth in the OU3 ROD, and this Consent Decree.

    c.      OU3 Remedial Design.

      (1)    Within 45 days after EPA's issuance of approval of the SOW, pursuant to Paragraph 12.b., Primary Settling Defendant shall submit to EPA a work

plan for the design of the OU3 Remedial Action at the Site ("OU3 Remedial Design Work Plan").  Subject to the specific reservation set forth in Paragraph 87.a, the OU3 Remedial Design Work Plan shall provide for design of the portion of the remedy set forth in the OU3 ROD that is to occur within the geographical boundaries of the Washington Facility, as generally depicted on Map I, attached as Appendix C1, in accordance with the OU3 SOW and for achievement of the Performance Standards and other requirements related to the above described area, as set forth in the OU3 ROD, this Consent Decree, and the OU3 SOW.  Upon its approval by EPA, the OU3 Remedial Design Work Plan shall be incorporated into and enforceable under this Consent Decree.  Within 45 days after EPA's issuance of an approval of the SOW, pursuant to Paragraph 12.b., Primary Settling Defendant shall submit to EPA a Health and Safety Plan for field design activities that conforms to the applicable Occupational Safety and Health Administration and EPA requirements including, but not limited to, 29 C.F.R. § 1910.120.

(2)   The OU3 Remedial Design Work Plan shall include plans and schedules for implementation of all remedial design and pre-design tasks identified in the OU3 SOW, including, but not limited to, plans and schedules for the completion of: (1) design sampling and analysis plan (including, but not limited to, a Remedial Design Quality Assurance Project Plan in accordance with Section VIII (Quality Assurance, Sampling, and Data Analysis)); (2) a Construction Quality Assurance Plan ("CQAP"); and may also include: (i) a treatability study, (ii) a Pre-design Work Plan, (iii) a preliminary design submission, (iv) an intermediate design submission, and (v) a pre-final/final design submission. In addition, the OU3 Remedial Design Work Plan shall include a schedule for completion of the OU3 Remedial Action Work Plan.

(3)   Upon approval of the OU3 Remedial Design Work Plan by EPA, after a reasonable opportunity for review and comment by the State, and submission of the Health and Safety Plan for all field activities to EPA and the State, Primary Settling Defendant shall implement the OU3 Remedial Design Work Plan.  Primary Settling Defendant shall submit to EPA and the State all plans, reports, and other deliverables required under the approved OU3 Remedial Design Work Plan in accordance with the approved schedule for review and approval pursuant to Section XI (EPA Approval of Plans, Reports, and Other Deliverables).  Unless otherwise directed by EPA, Primary Settling Defendant shall not commence further OU3 Remedial Design activities at the Site prior to approval of the OU3 Remedial Design Work Plan.

(4)   The preliminary design submission shall include, at a minimum, the following: (1) design criteria; (2) results of treatability studies; (3) results of additional field sampling and pre-design work; (4) project delivery strategy; (5) preliminary plans, drawings, and sketches; (6) required specifications in outline form; and (7) preliminary construction schedule.

(5)   The intermediate design submission, if required by EPA or if independently submitted by Primary Settling Defendant, shall be a continuation and expansion of the preliminary design.

(6)   The pre-final/final design submission shall include, at a minimum, the following: (1) final plans and specifications; (2) Operation and Maintenance Plan; (3) CQAP; (4) Field Sampling Plan (directed at measuring progress towards meeting Performance Standards); and (5) Contingency Plan.  The CQAP, which shall detail the approach to quality assurance during construction activities at the Site, shall specify a quality assurance official, independent of the Supervising Contractor, to conduct a quality assurance program during the construction phase of the project.

d.   OU3 Remedial Action.

(1)   Within 90 days after the approval of the final design submission, Primary Settling Defendant shall submit to EPA and the State a work plan for the performance of the OU3 Remedial Action at the Site ("OU3 Remedial Action Work Plan").  Subject to the specific reservation set forth in Paragraph 87.a, the OU3 Remedial Action Work Plan shall provide for construction and implementation of the portion of the remedy set forth in the OU3 ROD that is to occur within the geographical boundaries of the Washington Facility, as generally depicted on Map I, attached as Appendix C1, in accordance with the OU3 SOW, and achievement of the Performance Standards, in accordance with this Consent Decree, the OU3 ROD, the OU3 SOW, and the design plans and specifications developed in accordance with the OU3 Remedial Design Work Plan and approved by EPA.  Upon its approval by EPA, the OU3 Remedial Action Work Plan shall be incorporated into and enforceable under this Consent Decree.  At the same time as it submits the OU3 Remedial Action Work Plan, Primary Settling Defendant shall submit to EPA a Health and Safety Plan for field activities required by the OU3 Remedial Action Work Plan that conforms to the applicable Occupational Safety and Health Administration and EPA requirements including, but not limited to, 29 C.F.R. § 1910.120.

(2)   The OU3 Remedial Action Work Plan shall include the following: (1) schedule for completion of the Remedial Action; (2) method for selection of the contractor; (3) schedule for developing and submitting other required OU3 Remedial Action plans; (4) groundwater monitoring plan; (5) methods for satisfying permitting requirements; (6) methodology for implementing the Operation and Maintenance Plan; (7) methodology for implementing the Contingency Plan; (8) tentative formulation of the OU3 Remedial Action team; (9) CQAP (by construction contractor); and (10) procedures and plans for the decontamination of equipment and the disposal of contaminated materials.  The OU3 Remedial Action Work Plan also shall include the methodology for implementing the CQAP and a schedule for implementing all OU3 Remedial Action tasks identified in the final design submission and shall identify the initial formulation of Primary Settling Defendant's OU3 Remedial Action project team (including, but not limited to, the Supervising Contractor).

22

(3)    Upon approval of the OU3 Remedial Action Work Plan by EPA after a reasonable opportunity for review and comment by the State, Primary Settling Defendant shall implement the activities required under the OU3 Remedial Action Work Plan. Primary Settling Defendant shall submit to EPA and the State all reports and other deliverables required under the approved OU3 Remedial Action Work Plan in accordance with the approved schedule for review and approval pursuant to Section XI (EPA Approval of Plans, Reports, and Other Deliverables). Unless otherwise directed by EPA, Primary Settling Defendant shall not commence physical OU3 Remedial Action activities at the Site prior to approval of the OU3 Remedial Action Work Plan.

e.    Primary Settling Defendant shall continue to implement the OU3 Remedial Action, within the geographical boundaries of the Washington Facility, as generally depicted on Map I, attached as Appendix C1, until the Performance Standards are achieved. Primary Settling Defendant shall implement O&M for so long thereafter as is required by this Consent Decree.

f.    Modification of OU3 SOW or Related Work Plans.

(1)    If EPA determines that it is necessary to modify the work specified in the OU3 SOW and/or in work plans developed pursuant to the OU3 SOW to achieve and maintain the Performance Standards or to carry out and maintain the effectiveness of the remedy to be set forth in the OU3 ROD, and such modification is consistent with the scope of the remedy set forth in the OU3 ROD, then EPA may issue such modification in writing and shall notify Primary Settling Defendant of such modification. For the purposes of this Paragraph, Paragraphs 50.c (Completion of the OU3 Remedial Action) and 51 (Completion of the Work) only, the "scope of the remedy set forth in the ROD" is the objectives set forth in the Description of Selected Remedy section of the OU3 ROD. If Primary Settling Defendant objects to the modification, it may, within 30 days after EPA's notification, seek dispute resolution under Paragraph 70 (Record Review).

(2)    The OU3 SOW and/or related work plans shall be modified: (1) in accordance with the modification issued by EPA; or (2) if Primary Settling Defendant invokes dispute resolution, in accordance with the final resolution of the dispute. The modification shall be incorporated into and enforceable under this Consent Decree, and Primary Settling Defendant shall implement all work required by such modification. Primary Settling Defendant shall incorporate the modification into the Remedial Design or Remedial Action Work Plan under Paragraph 12.c (Remedial Design) or Paragraph 12.d (Remedial Action), as appropriate.

(3)    Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this Consent Decree.

13.    Performance of the 2013 Vapor Intrusion Removal Action.

23

a.    Selection of Supervising Contractor for 2013 Vapor Intrusion Removal Action.

(1)    Primary Settling Defendant has retained Environ International Corporation as its supervising contractor to perform the 2013 Vapor Intrusion Work at the Washington Facility. Primary Settling Defendant shall also notify EPA of the name(s) and qualification(s) of any other contractor(s) or subcontractor(s) retained to perform the 2013 Vapor Intrusion Work at least 14 days prior to commencement of such 2013 Vapor Intrusion Work. EPA retains the right to disapprove of any or all of the contractors and/or subcontractors retained by Primary Settling Defendant. If EPA disapproves of a selected contractor, Primary Settling Defendant shall retain a different contractor and shall notify EPA of that contractor's name and qualifications within 7 days after EPA's disapproval.

b.    Description of the 2013 Vapor Intrusion Work.

(1)    Upon entry of this Consent Decree, Primary Settling Defendant shall continue to operate and maintain the current SVE and SSDS systems implemented at the Washington Facility, as set forth in the Vapor Intrusion SOW and work plans as a removal measure, until EPA determines that such operation and maintenance is no longer necessary.

(2)    Primary Settling Defendant shall install a new SVE system to address the long term remediation and the additional requirements for monitoring and controls at the Washington Facility in accordance with the terms and schedule in the work plans set forth in the Vapor Intrusion SOW.

(3)    Within 45 days after the startup of the new SVE system, Primary Settling Defendant shall submit the Final SVE Design Report with as-built drawings and operation, monitoring and maintenance ("OM&M") plan, in accordance with the requirements of the Vapor Intrusion SOW.

c.    Final Removal Action Report. Within 30 days after completion of all 2013 Vapor Intrusion Work required by this Consent Decree and Vapor Intrusion SOW, or an earlier date as determined by EPA if the OU3 ROD supersedes or incorporates the 2013 Vapor Intrusion Work, Primary Settling Defendant shall submit for EPA review and approval a final report summarizing the removal actions taken to comply with this Consent Decree. The final report shall conform, at a minimum, with the requirements set forth in Section 300.165 of the NCP entitled "OSC Reports." The final report shall include a good faith estimate of total costs or a statement of actual costs incurred in complying with the 2013 Vapor Intrusion Work provisions of the Consent Decree and, as appropriate, a listing of quantities and types of materials removed from the Washington Facility or handled at the Washington Facility, a discussion of removal and disposal options considered for those materials, a list of the ultimate destination(s) of those materials, a presentation of the analytical results of all sampling and analyses performed, and accompanying appendices containing all relevant documentation generated during the removal action (e.g., manifests, invoices, bills, contracts, and permits). The

final report shall also include the following certification signed by a person who supervised or directed the preparation of the report:

> "Under penalty of law, I certify that to the best of my knowledge, after appropriate inquiries of all relevant persons involved in the preparation of the report, the information submitted is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

      d.     Modification of Vapor Intrusion SOW or Related Work Plans.

     (1)   EPA may make modifications to the Vapor Intrusion SOW, or any plan or schedule, in writing or by oral direction. Any oral modification will be memorialized in writing by EPA promptly, but shall have as its effective date the date of the oral direction.

     (2)   If Primary Settling Defendant seeks permission to deviate from any approved work plan or schedule or SOW, Primary Settling Defendant's Project Coordinator shall submit a written request to EPA for approval outlining the proposed modification and its basis. Primary Settling Defendant may not proceed with the requested deviation until receiving oral or written approval from the OSC.

    14.    Nothing in this Consent Decree, the OU1 SOW, the OU2 SOW, the OU3 SOW, the Vapor Intrusion SOW, or any of the work plans described in this Section VI, constitutes a warranty or representation of any kind by Plaintiff that compliance with the work requirements set forth in therein will achieve the Performance Standards set forth in the OU1 ROD, the OU2 ROD, to be set forth in the OU3 ROD, or set forth in any decision document related to the 2013 Vapor Intrusion Removal Action.

    15.    <u>Off-Site Shipment of Waste Material.</u>

     a.     Primary Settling Defendant may ship Waste Material from the Site to an off-Site facility only if it verifies, prior to any shipment, that the off-Site facility is operating in compliance with the requirements of Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440, by obtaining a determination from EPA that the proposed receiving facility is operating in compliance with 42 U.S.C. § 9621(d)(3) and 40 C.F.R. § 300.440.

     b.     Primary Settling Defendant may ship Waste Material from the Site to an out-of-state waste management facility only if, prior to any shipment, it provides written notice to the appropriate state environmental official in the receiving facility's state and to the respective EPA Project Coordinator. This notice requirement shall not apply to any off-Site shipments when the total quantity of all such shipments will not exceed ten cubic yards. The written notice shall include the following information, if available: (1) the name and location of the receiving facility; (2) the type and quantity of Waste Material to be shipped; (3) the schedule for the shipment; and (4) the method of transportation. Primary Settling Defendant also shall notify the state environmental official referenced above and the respective EPA Project Coordinator of any major changes in the shipment plan, such as a decision to ship the Waste

Material to a different out-of-state facility. For each OU, Primary Settling Defendant shall provide the written notice after the award of the contract for the relevant Remedial Action construction and before the Waste Material is shipped.

## VII.   REMEDY REVIEW

16.    <u>Periodic Review</u>.  Primary Settling Defendant shall conduct any studies and investigations that EPA requests in order to permit EPA to conduct reviews of whether the Remedial Actions are protective of human health and the environment at least every five years as required by Section 121(c) of CERCLA, 42 U.S.C. § 9621(c), and any applicable regulations.

17.    <u>EPA Selection of Further Response Actions</u>.  If EPA determines, at any time, that the Remedial Actions are not protective of human health and the environment, EPA may select further response actions for the Site in accordance with the requirements of CERCLA and the NCP.

18.    <u>Opportunity To Comment</u>.  Settling Defendants and, if required by Sections 113(k)(2) or 117 of CERCLA, 42 U.S.C. § 9613(k)(2) or 9617, the public, will be provided with an opportunity to comment on any further response actions proposed by EPA as a result of the review conducted pursuant to Section 121(c) of CERCLA and to submit written comments for the record during the comment period.

19.    <u>Primary Settling Defendant's Obligation To Perform Further Response Actions</u>. If EPA selects further response actions for the Site, EPA may require Primary Settling Defendant to perform such further response actions, but only to the extent that the reopener conditions in Paragraph 87 (United States' Specific Reservations) are satisfied.

a.    Primary Settling Defendant may invoke the procedures set forth in Section XIX (Dispute Resolution) to dispute (a) EPA's determination that the reopener conditions of Paragraph 87.a, Paragraph 87.b, or Paragraph 87.c are satisfied, (b) EPA's determination that the Remedial Actions are not protective of human health and the environment, or (c) EPA's selection of the further response actions. Disputes pertaining to whether the Remedial Actions are protective or to EPA's selection of further response actions shall be resolved pursuant to Paragraph 70 (Record Review).

20.    <u>Submission of Plans</u>.  If Primary Settling Defendant is required to perform further response actions pursuant to Paragraph 19, it shall submit a plan for such response action to EPA for approval in accordance with the procedures of Section VI (Performance of the Work by Primary Settling Defendant).  Primary Settling Defendant shall implement the approved plan in accordance with this Consent Decree.

## VIII.   QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS

21.    <u>Quality Assurance</u>.

a.       Primary Settling Defendant shall use quality assurance, quality control, and chain of custody procedures for all treatability, design, compliance, and monitoring samples in accordance with the Uniform Federal Policy for Implementing Quality Systems (UFP-QS), (EPA/505/F-03/001, March 2005) and subsequent amendments to such guidelines upon notification by EPA to Primary Settling Defendant of such amendment.  Amended guidelines shall apply only to procedures conducted after such notification.

b.       Prior to the commencement of any monitoring project under this Consent Decree, Primary Settling Defendant shall submit to EPA for approval a Quality Assurance Project Plan ("QAPP") that is consistent with the OU1 SOW,  the OU2 SOW, the Vapor Intrusion SOW, the NCP, and applicable guidance documents.  Within 30 days after the completion of the OU3 SOW, Primary Settling Defendant shall ensure that the QAPP is consistent with the OU3 SOW.  If the QAPP is inconsistent with the OU3 SOW, Primary Settling Defendant shall submit to EPA for approval a revised QAPP.  If relevant to the proceeding, the Parties agree that validated sampling data generated in accordance with the QAPP(s) and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this Consent Decree.  Primary Settling Defendant shall ensure that EPA personnel and its authorized representatives are allowed access at reasonable times to all laboratories utilized by Primary Settling Defendant in implementing this Consent Decree.  In addition, Primary Settling Defendant shall ensure that such laboratories shall analyze all samples submitted by EPA pursuant to the QAPP for quality assurance monitoring.  Primary Settling Defendant shall ensure that the laboratories it utilizes for the analysis of samples taken pursuant to this Consent Decree perform all analyses according to accepted EPA methods.  Accepted EPA methods consist of those methods that are documented in the "USEPA Contract Laboratory Program Statement of Work for Inorganic Analysis, ILM05.4," and the "USEPA Contract Laboratory Program Statement of Work for Organic Analysis, SOM01.2," and any amendments made thereto during the course of the implementation of this Consent Decree; however, upon approval by EPA, after opportunity for review and comment by the State, Primary Settling Defendant may use other analytical methods that are as stringent as or more stringent than the CLP-approved methods. Primary Settling Defendant shall ensure that all laboratories it uses for analysis of samples taken pursuant to this Consent Decree participate in an EPA or EPA-equivalent quality assurance/quality control ("QA/QC") program.  Primary Settling Defendant shall use only laboratories that have a documented Quality System that complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs" (American National Standard, January 5, 1995), and "EPA Requirements for Quality Management Plans (QA/R-2)" (EPA/240/B-01/002, March 2001, reissued May 2006) or equivalent documentation as determined by EPA.  EPA may consider laboratories accredited under the National Environmental Laboratory Accreditation Program ("NELAP") as meeting the Quality System requirements.  Primary Settling Defendant shall ensure that all field methodologies utilized in collecting samples for subsequent analysis pursuant to this Consent Decree are conducted in accordance with the procedures set forth in the QAPP approved by EPA.

22.       Upon request, Primary Settling Defendant shall allow split or duplicate samples to be taken by EPA or its authorized representatives.  Primary Settling Defendant shall notify EPA not less than 28 days in advance of any sample collection activity unless shorter notice is agreed

to by EPA. In addition, EPA shall have the right to take any additional samples that EPA deems necessary. Upon request, EPA shall allow Primary Settling Defendant to take split or duplicate samples of any samples it takes as part of Plaintiff's oversight of Primary Settling Defendant's implementation of the Work.

23.     Primary Settling Defendant shall submit to EPA 3 copies of the results of all sampling and/or tests or other data obtained or generated by or on behalf of Primary Settling Defendant with respect to the Site and/or the implementation of this Consent Decree unless EPA agrees otherwise.

24.     Notwithstanding any provision of this Consent Decree, the United States retains all of its information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

IX.     ACCESS AND INSTITUTIONAL CONTROLS

25.     If the Site, or any other real property where access and/or land/water use restrictions are needed, is owned or controlled by Primary Settling Defendant or Owner Settling Defendant:

a.     such Settling Defendants shall, commencing on the date of lodging of the Consent Decree, provide the United States and the other Settling Defendants, and their representatives, contractors, and subcontractors, with access at all reasonable times to the Site, or such other real property, to conduct any activity required in connection with the Consent Decree, including, but not limited to, the following activities:

(1)     Monitoring the Work;

(2)     Verifying any data or information submitted to the United States;

(3)     Conducting investigations regarding contamination at or near the Site;

(4)     Obtaining samples;

(5)     Assessing the need for, planning, or implementing additional response actions at or near the Site;

(6)     Assessing implementation of quality assurance and quality control practices as defined in the approved CQAP;

(7)     Implementing the Work pursuant to the conditions set forth in Paragraph 89 (Work Takeover);

(8)     Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by such Settling Defendants or their agents, consistent with Section XXV (Access to Information);

28

(9)   Assessing such Settling Defendants' compliance with the Consent Decree;

(10)   Determining whether the Site or other real property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the Consent Decree; and

(11)   Implementing, monitoring, maintaining, reporting on, and enforcing any Institutional Controls.

EPA will coordinate such access activities with Primary Settling Defendant and Owner Settling Defendant in an effort to minimize adverse impacts on Washington Facility plant operations and the ongoing vapor intrusion removal activities.

b.   commencing on the date of lodging of the Consent Decree, such Settling Defendants shall not use the Site, or such other real property, in any manner that EPA determines will pose an unacceptable risk to human health or to the environment due to exposure to Waste Material or interfere with or adversely affect the implementation, integrity, or protectiveness of the Remedial Actions, 2013 Vapor Intrusion Removal Action, or O&M.  Such Settling Defendants shall comply with restrictions on well installation and groundwater use, including the Well Restriction Area ("WRA") established by the State pursuant to N.J.A.C. 7:10, the OU1 CEA and the OU2 CEA, and any similar restrictions to be set forth in the OU3 ROD; and;

c.   such Settling Defendants shall:

(1)   execute and record in the appropriate land records office Proprietary Controls that: (i) grant a right of access to conduct any activity required in connection with the Consent Decree including, but not limited to, those activities listed in Paragraph 25.a; and (ii) grant the right to enforce the land/water use restrictions set forth in Paragraph 25.b, including, but not limited to, the specific restrictions listed therein, as further specified in Appendix D and this Paragraph 25.c. The Proprietary Controls shall be granted to one or more of the following persons, as determined by EPA: (i) the United States, on behalf of EPA, and its representatives; (ii) the State and its representatives; (iii) the other Settling Defendants and their representatives; and/or (iv) other appropriate grantees. The Proprietary Controls, other than those granted to the United States, shall include a designation that EPA (and/or the State as appropriate) is a third-party beneficiary, allowing EPA to maintain the right to enforce the Proprietary Controls without acquiring an interest in real property. If any Proprietary Controls are granted to any Settling Defendants pursuant to this Paragraph 25.c(1), then such Settling Defendants shall monitor, maintain, report on, and enforce such Proprietary Controls.

(2)   within 30 days after a written request by EPA, submit to EPA for review and approval regarding such real property: (i)  draft Proprietary Controls in substantially the form attached hereto as Appendix D, that are enforceable under state law; and (ii) a current title insurance commitment or other evidence of title acceptable to EPA, that shows all prior liens and encumbrances.

(3)   within 15 days after EPA's approval and acceptance of the Proprietary Controls and the title evidence, update the title search and, if it is determined that nothing has occurred since the effective date of the commitment, or other title evidence, to affect the title adversely, record the Proprietary Controls with the appropriate land records office.  Within 30 days after recording the Proprietary Controls, such Settling Defendants shall provide EPA with a final title insurance policy, or other final evidence of title acceptable to EPA, and a certified copy of the original recorded Proprietary Controls showing the clerk's recording stamps.  If the Proprietary Controls are to be conveyed to the United States, the Proprietary Controls and title evidence (including final title evidence) shall be prepared in accordance with the U.S. Department of Justice Title Standards 2001, and approval of the sufficiency of title shall be obtained as required by 40 U.S.C. § 3111.

26.     If the Site, or any other real property where access and/or land/water use restrictions are needed, is owned or controlled by persons other than Primary Settling Defendant or Owner Settling Defendant:

a.     Primary Settling Defendant shall use best efforts to secure from such persons:

(1)   an agreement to provide access thereto for the United States  and Settling Defendants, and their representatives, contractors, and subcontractors, to conduct any activity regarding the Consent Decree including, but not limited to, the activities listed in Paragraph 25.a;

(2)   an agreement, enforceable by Settling Defendants and the United States, to refrain from using the Site, or such other real property, in any manner that EPA determines will pose an unacceptable risk to human health or to the environment due to exposure to Waste Material or interfere with or adversely affect the implementation, integrity, or protectiveness of the Remedial Actions, 2013 Vapor Intrusion Removal Action, and O&M.  The agreement shall include, but not be limited to, the land/water use restrictions listed in Paragraph 25.b; and

(3)   the execution and recordation in the appropriate land records office of Proprietary Controls, that (i) grant a right of access to conduct any activity regarding the Consent Decree including, but not limited to, those activities listed in Paragraph 25.a, and (ii) grant the right to enforce the land/water use restrictions set forth in Paragraph 25.b, including, but not limited to, the specific restrictions listed therein, as further specified in Appendix D.  The Proprietary Controls shall be granted to one or more of the following persons, as determined by EPA: (i) the United States, on behalf of EPA, and its representatives, (ii) the State and its representatives, (iii) Settling Defendants and their representatives, and/or (iv) other appropriate grantees.  The Proprietary Controls, other than those granted to the United States, shall include a designation that EPA (and/or the State as appropriate) is a third party beneficiary, allowing EPA to maintain the right to enforce the Proprietary Controls without acquiring an interest in real property.  If any Proprietary Controls are granted to any Settling Defendant(s) pursuant to this Paragraph 25.c(3) , then any such

Settling Defendant(s) shall monitor, maintain, report on, and enforce such Proprietary Controls.

b.       Within 30 days after a written request by EPA, Primary Settling Defendant and/or Owner Settling Defendant shall submit to EPA, for review and approval regarding such property, draft Proprietary Controls that are enforceable under state law, in accordance with the draft Proprietary Controls, attached hereto as Appendix D; and (ii) a current title insurance commitment, or other evidence of title acceptable to EPA, that shows all prior liens and encumbrances.

c.       Within 15 days of EPA's approval and acceptance of the Proprietary Controls and the title evidence, such Settling Defendants shall update the title search and, if it is determined that nothing has occurred since the effective date of the commitment, or other title evidence, to affect the title adversely, record the Proprietary Controls with the appropriate land records office.  Within 30 days after the recording of the Proprietary Controls, such Settling Defendants shall provide EPA with a final title insurance policy, or other final evidence of title acceptable to EPA, and a certified copy of the original recorded Proprietary Controls showing the clerk's recording stamps.  If the Proprietary Controls are to be conveyed to the United States, the Proprietary Controls and title evidence (including final title evidence) shall be prepared in accordance with the U.S. Department of Justice Title Standards 2001, and approval of the sufficiency of title shall be obtained as required by 40 U.S.C. § 3111.

27.     For purposes of Paragraphs 25.c(2), 26.a and 26.b, "best efforts" includes the payment of reasonable sums of money to obtain access, an agreement to restrict land/water use, Proprietary Controls, and/or an agreement to release or subordinate a prior lien or encumbrance. If, within 120 days after the Effective Date, such Settling Defendants have not: (a) obtained agreements to provide access, restrict land/water use, or record Proprietary Controls, as required by Paragraph 26.a(1), 26.a(2), or 26.a(3); or (b) obtained, pursuant to Paragraph 25.c(2) or 26.b, agreements from the holders of prior liens or encumbrances to release or subordinate such liens or encumbrances to the Proprietary Controls, such Settling Defendants shall promptly notify the United States in writing, and shall include in that notification a summary of the steps that such Settling Defendants have taken to attempt to comply with Paragraph 25 or 25.c(3).  The United States may, as it deems appropriate, assist such Settling Defendants in obtaining access, agreements to restrict land/water use, Proprietary Controls, or the release or subordination of a prior lien or encumbrance.  Such Settling Defendants shall reimburse the United States under Section XVI (Payments) for all costs incurred, direct or indirect, by the United States in obtaining such access, agreements to restrict land/water use, Proprietary Controls, and/or release/subordination of prior liens or encumbrances including, but not limited to, the cost of attorney time and the amount of monetary consideration paid or just compensation.

28.     If EPA determines that Institutional Controls in the form of state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls are needed at or in connection with the Site, such Settling Defendants shall cooperate with EPA's efforts to secure and ensure compliance with such governmental controls.

29.     Notwithstanding any provision of the Consent Decree, the United States retains all of its access authorities and rights, as well as all of its rights to require Institutional Controls,

31

including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statute or regulations.

## X.    REPORTING REQUIREMENTS

30.     In addition to any other requirement of this Consent Decree, Primary Settling Defendant shall submit to EPA and the State 3 copies of written monthly progress reports for each OU and the 2013 Vapor Intrusion Removal Action that meet the requirements set forth in each respective SOW.  Primary Settling Defendant shall submit these progress reports to EPA and the State by the tenth day of every month following the lodging of this Consent Decree until EPA notifies Settling Defendants pursuant to Paragraph 51 of Section XIV (Certification of Completion).  If requested by EPA, Primary Settling Defendant shall also provide briefings for EPA to discuss the progress of the Work.

31.     Primary Settling Defendant shall notify EPA of any change in the schedule described in the monthly progress report for the performance of any activity, including, but not limited to, data collection and implementation of work plans, no later than seven days prior to the performance of the activity.

32.     Upon the occurrence of any event during performance of the Work that Primary Settling Defendant is required to report pursuant to Section 103 of CERCLA, 42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community Right-to-know Act ("EPCRA"), 42 U.S.C. § 11004, Primary Settling Defendant shall within 24 hours of the onset of such event orally notify the respective EPA Project Coordinator or the respective Alternate EPA Project Coordinator (in the event of the unavailability of the EPA Project Coordinator), or, in the event that neither the EPA Project Coordinator nor Alternate EPA Project Coordinator is available, the Emergency Response Section, Region 2, United States Environmental Protection Agency.  These reporting requirements are in addition to the reporting required by CERCLA Section 103 or EPCRA Section 304.

33.     Within 20 days after the onset of such an event, Primary Settling Defendant shall furnish to EPA a written report, signed by Primary Settling Defendant's Project Coordinator, setting forth the events that occurred and the measures taken, and to be taken, in response thereto.  Within 30 days after the conclusion of such an event, Primary Settling Defendant shall submit a report setting forth all actions taken in response thereto.

34.     Primary Settling Defendant shall submit 3 copies of all plans, reports, data, and other deliverables required by the SOW, the Remedial Design Work Plan, the Remedial Action Work Plan, or any other approved plans to EPA in accordance with the schedules set forth in such plans.  Primary Settling Defendant shall simultaneously submit 3 copies of all such plans, reports, data, and other deliverables to the State.  Upon request by EPA, Primary Settling Defendant shall submit in electronic form all or any portion of any deliverables Primary Settling Defendant is required to submit pursuant to the provisions of this Consent Decree.

35.     All deliverables submitted by Primary Settling Defendant to EPA that purport to document Primary Settling Defendant's compliance with the terms of this Consent Decree shall be signed by an authorized representative of Primary Settling Defendant.

XI.    EPA APPROVAL OF PLANS, REPORTS, AND OTHER DELIVERABLES

36.    <u>Initial Submissions</u>.

a.    After review of any plan, report, or other deliverable that is required to be submitted for approval pursuant to this Consent Decree, EPA shall: (1) approve, in whole or in part, the submission; (2) approve the submission upon specified conditions; (3) disapprove, in whole or in part, the submission; or (4) any combination of the foregoing.

b.    EPA also may modify the initial submission to cure deficiencies in the submission if: (1) EPA determines that disapproving the submission and awaiting a resubmission would cause substantial disruption to the Work; or (2) previous submission(s) have been disapproved due to material defects and the deficiencies in the initial submission under consideration indicate a bad faith lack of effort to submit an acceptable plan, report, or deliverable.

37.    <u>Resubmissions</u>.  Upon receipt of a notice of disapproval under Paragraph 36.a(3) or (4), or if required by a notice of approval upon specified conditions under Paragraph 36.a(2), Primary Settling Defendant shall, within 15 days or such longer time as specified by EPA in such notice, correct the deficiencies and resubmit the plan, report, or other deliverable for approval. After review of the resubmitted plan, report, or other deliverable, EPA may: (a) approve, in whole or in part, the resubmission; (b) approve the resubmission upon specified conditions; (c) modify the resubmission; (d) disapprove, in whole or in part, the resubmission, requiring Primary Settling Defendant to correct the deficiencies; or (e) any combination of the foregoing.

38.    <u>Material Defects</u>.  If an initially submitted or resubmitted plan, report, or other deliverable contains a material defect, and the plan, report, or other deliverable is disapproved or modified by EPA under Paragraph 36.b(2) or 37 due to such material defect, then the material defect shall constitute a lack of compliance for purposes of Paragraph 73.  The provisions of Section XIX (Dispute Resolution) and Section XX (Stipulated Penalties) shall govern the accrual and payment of any stipulated penalties regarding Primary Settling Defendant's submissions under this Section.

39.    <u>Implementation</u>.  Upon approval, approval upon conditions, or modification by EPA under Paragraph 36 (Initial Submissions) or Paragraph 37 (Resubmissions), of any plan, report, or other deliverable, or any portion thereof: (a) such plan, report, or other deliverable, or portion thereof, shall be incorporated into and enforceable under this Consent Decree; and (b) Primary Settling Defendant shall take any action required by such plan, report, or other deliverable, or portion thereof, subject only to its right to invoke the Dispute Resolution procedures set forth in Section XIX (Dispute Resolution) with respect to the modifications or conditions made by EPA.  The implementation of any non-deficient portion of a plan, report, or other deliverable submitted or resubmitted under Paragraph 36 or 37 shall not relieve Primary Settling Defendant of any liability for stipulated penalties under Section XX (Stipulated Penalties).

## XII.   PROJECT COORDINATORS

40.   <u>Selection of Project Coordinators.</u>

a.      Within 20 days after lodging this Consent Decree, Primary Settling Defendant and EPA will notify each other, in writing, of the name, address, telephone number, and email address of its respective designated Project Coordinators and Alternate Project Coordinators for OU1 and the 2013 Vapor Intrusion Removal Action.

b.      Within 20 days after EPA sends notification of completion of the OU2 Final Remedial Design, Primary Settling Defendant and EPA will notify each other, in writing, of the name, address, telephone number, and email address of its respective designated Project Coordinator and Alternate Project Coordinator for OU2.

c.      Within 30 days after the issuance of the OU3 ROD, Primary Settling Defendant and EPA will notify each other, in writing, of the name, address, telephone number, and email address of their respective designated Project Coordinator and Alternate Project Coordinator for OU3.

d.      EPA approves Bruce Kennington of ENVIRON International Corporation as Primary Settling Defendant's Project Coordinator for OU1 and the 2013 Vapor Intrusion Removal Action, and Roy Duckett of Rio Tinto AUM as Primary Settling Defendant's Project Coordinator for OU2.  EPA further approves Roy Duckett of Rio Tinto AUM as Primary Settling Defendant's Alternate Project Coordinator for OU1 and the 2013 Vapor Intrusion Removal Action.  Consistent with Paragraph 11.a, EPA approves Bruce Kennington of ENVIRON International Corporation as Primary Settling Defendant's Alternate Project Coordinator for OU2. EPA reserves the right to withdraw such approval. Successor Project Coordinators and Successor Alternate Project Coordinators shall be subject to disapproval by EPA.  Primary Settling Defendant's Project Coordinators and Alternate Project Coordinators shall not be an attorney for any Settling Defendant in this matter.  Each Project Coordinator designated pursuant to this Paragraph 40 who may be employees of the Supervising Contractor(s), or Project Coordinator in the case of OU2, shall be responsible for the day-to-day management of all Work to be performed pursuant to the relevant portions of this Consent Decree and relevant SOWs. Each Project Coordinator shall have adequate technical and managerial experience to manage all Work described in the relevant SOW and under the Consent Decree.  Each Project Coordinator shall be the primary contact for EPA on all matters relating to the relevant Work at the Site and should be available for EPA to contact during all working days.  He or she may assign other representatives, including other contractors, to serve as a Site representative for oversight of performance of daily operations during remedial activities.   If a Project Coordinator or Alternate Project Coordinator initially designated is changed, the identity of the successor will be given to the other Parties at least five working days before the change occurs, unless impracticable, but in no event later than the actual day the change is made.

41.     Plaintiff may designate other representatives, including, but not limited to, EPA employees, and federal contractors and consultants, to observe and monitor the progress of any activity undertaken pursuant to this Consent Decree. EPA's Project Coordinators and Alternate Project Coordinators shall have the authority lawfully vested in a Remedial Project Manager

("RPM") and an On-Scene Coordinator ("OSC") by the NCP, 40 C.F.R. Part 300. EPA's Project Coordinators or Alternate Project Coordinators shall have authority, consistent with the NCP, to halt any Work required by this Consent Decree and to take any necessary response action when he or she determines that conditions at the Site constitute an emergency situation or may present an immediate threat to public health or welfare or the environment due to release or threatened release of Waste Material.

42.     EPA's Project Coordinator for each OU and the 2013 Vapor Intrusion Removal Action and Primary Settling Defendant's Project Coordinator for each OU and the 2013 Vapor Intrusion Removal Action will meet with one another, at a minimum, on a monthly basis. During the construction of the Remedial Actions for OU1 and OU2, the Project Coordinators shall meet on a weekly basis in accordance with the OU1 and OU2 SOWS.

## XIII.   PERFORMANCE GUARANTEE

43.     In order to ensure the full and final completion of the Work, Primary Settling Defendant shall establish and maintain three separate performance guarantees, including:

a.     A performance guarantee for the OU1 Work, initially in the amount of $12,848,918 for the benefit of EPA (hereinafter "Estimated Cost of the OU1 Work").

b.     A performance guarantee for the OU2 Work, initially in the amount of $26,115,350 for the benefit of EPA (hereinafter "Estimated Cost of the OU2 Work").

c.     Within sixty (60) days of the issuance of the OU3 ROD, Primary Settling Defendant shall establish and maintain a performance guarantee for the OU3 Work in the amount set forth in the OU3 ROD, for the benefit of EPA (hereinafter "Estimated Cost of the OU3 Work").

44.     Rio Tinto AUM shall provide an additional performance guarantee to fund the OU1 Work and OU2 Work, in an amount equal to the sum of amounts set forth in Paragraphs 43(a) and (b), executed in favor of EPA. On the same date that Primary Settling Defendant establishes its performance guarantee for OU3, as set forth in paragraph 43.c, Rio Tinto AUM shall establish its performance guarantee for OU3 in an amount equal to the sum posted by Primary Settling Defendant pursuant to Paragraph 43.c.

45.     The performance guarantees listed in Paragraphs 43.a through 43.c and 44, which must be satisfactory in form and substance to EPA, shall be in the form of one or more of the following liquid mechanisms, subject to EPA approval:

a.     A surety bond unconditionally guaranteeing payment and/or performance of the Work that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b.     One or more irrevocable letters of credit, payable to or at the direction of EPA, that is issued by one or more financial institution(s) (1) that has the authority to issue

letters of credit and (2) whose letter-of-credit operations are regulated and examined by a federal or state agency;

c.     A trust fund established for the benefit of EPA that is administered by a trustee (1) that has the authority to act as a trustee and (2) whose trust operations are regulated and examined by a federal or state agency;

46.     Primary Settling Defendant and Rio Tinto AUM have each selected, and EPA has found satisfactory, as initial performance guarantees irrevocable letters of credit pursuant to Paragraph 45.b, in substantially the form attached hereto as Appendix F. Any changes from the form attached as Appendix F are subject to EPA approval. Within ten days after the Effective Date, Primary Settling Defendant and Rio Tinto AUM shall execute or otherwise finalize all instruments or other documents required in order to make the selected performance guarantees legally binding in a form substantially identical to the documents attached hereto as Appendix F, and such performance guarantees shall thereupon be fully effective. Within 30 days after the Effective Date, Primary Settling Defendant and Rio Tinto AUM shall submit copies of all executed and/or otherwise finalized instruments or other documents required in order to make the selected performance guarantees legally binding to the EPA Regional Financial Management Officer in accordance with Section XXVII (Notices and Submissions), with a copy to the United States, EPA, and the Secondary Settling Defendants, as specified in Section XXVII.

47.     In the event that EPA determines at any time that a performance guarantee provided by Primary Settling Defendant pursuant to Paragraph 43, or provided by Rio Tinto AUM pursuant to Paragraph 44, is inadequate or otherwise no longer satisfies the requirements set forth in this Section, whether due to an increase in the estimated cost of completing the Work or for any other reason, or in the event that Primary Settling Defendant or Rio Tinto AUM become aware of information indicating that a performance guarantee provided pursuant to this Section is inadequate or otherwise no longer satisfies the requirements set forth in this Section, whether due to an increase in the estimated cost of completing the Work or for any other reason, Primary Settling Defendant or Rio Tinto AUM, within 30 days after receipt of notice of EPA's determination or, as the case may be, within 30 days after Primary Settling Defendant or Rio Tinto AUM becomes aware of such information, shall obtain and present to EPA for approval a proposal for a revised or alternative form of performance guarantee listed in Paragraph 45 that satisfies all requirements set forth in this Section XIII; provided, however, that if Primary Settling Defendant or Rio Tinto AUM cannot obtain such revised or alternative form of performance guarantee within such 30-day period, and provided further that the Primary Settling Defendant or Rio Tinto AUM shall have commenced to obtain such revised or alternative form of performance guarantee within such 30-day period, and thereafter diligently proceeds to obtain the same, EPA shall extend such period for such time as is reasonably necessary for the Primary Settling Defendant or Rio Tinto AUM in the exercise of due diligence to obtain such revised or alternative form of performance guarantee, such additional period not to exceed 30 days. In seeking approval for a revised or alternative form of performance guarantee, Primary Settling Defendant or Rio Tinto AUM shall follow the procedures set forth in Paragraph 49.b(2). Primary Settling Defendant or Rio Tinto AUM's inability to post performance guarantees for completion of the Work shall in no way excuse performance of any other requirements of this

Consent Decree, including, without limitation, the obligation of Primary Settling Defendant to complete the Work in strict accordance with the terms of this Consent Decree.

      48.    <u>Funding for Work Takeover.</u>

      a.    The issuance of any Work Takeover Notice pursuant to Paragraph 89, if not remedied as specified in Paragraph 89.a, shall trigger EPA's right to receive the full benefit of the performance guarantees provided pursuant to Paragraphs 43.a, 43.b, and 43.c for the portion of the Work subject to the Work Takeover Notice; and at such time EPA shall have immediate access to resources guaranteed under any such performance guarantees, consistent with Paragraph 89 (Work Takeover), whether in cash or in kind, necessary to continue and complete the Work, as determined by EPA. Upon the commencement of any Work Takeover, if for any reason EPA is unable to promptly secure the resources guaranteed under any such performance guarantees, whether in cash or in kind, necessary to continue and complete the Work, as determined by EPA, Primary Settling Defendant shall immediately, upon written demand from EPA, deposit into such account as EPA may specify consistent with Paragraph 89, in immediately available funds and without setoff, counterclaim, or condition of any kind, a cash amount up to but not exceeding the estimated cost of completing the Work as of such date, as determined by EPA. In addition, if at any time EPA is notified by the issuer of a performance guarantee that such issuer intends to cancel the performance guarantee mechanism it has issued, then, unless Primary Settling Defendant provides a substitute performance guarantee mechanism in accordance with this Section XIII no later than 30 days prior to the impending cancellation date, EPA shall be entitled (as of and after the date that is 30 days prior to the impending cancellation) to draw fully on the funds guaranteed under the then-existing performance guarantee consistent with Paragraph 89. All EPA Work Takeover costs not reimbursed under this Paragraph shall be reimbursed under Section XVI (Payments).

      b.    Upon the commencement of any Work Takeover, if for any reason EPA is unable to promptly secure the resources guaranteed under any performance guarantees listed in Paragraphs 43.a, 43.b, and/or 43.c, whether in cash or in kind, necessary to continue and complete the Work under the Work Takeover, and EPA is unable to secure the estimated cost of completing the Work in accordance with the procedures set forth in Paragraph 48.a, Rio Tinto AUM shall immediately, upon written demand from EPA, deposit into such account as EPA may specify consistent with Paragraph 89, in immediately available funds and without setoff, counterclaim, or condition of any kind, a cash amount up to but not exceeding the estimated cost of completing the Work as of such date, as determined by EPA. In addition, if at any time EPA is notified by the issuer of a performance guarantee that such issuer intends to cancel the performance guarantee mechanism it has issued, then, unless Rio Tinto AUM provides a substitute performance guarantee mechanism in accordance with this Section XIII no later than 30 days prior to the impending cancellation date, EPA shall be entitled (as of and after the date that is 30 days prior to the impending cancellation) to draw fully on the funds guaranteed under the then-existing performance guarantee. In the event that EPA subsequently receives the proceeds of some or all of Primary Settling Defendant's performance guarantees listed in Paragraphs 43.a, 43.b, and/or 43.c, EPA shall return to Rio Tinto AUM funds equal to the amount by which all proceeds provided to EPA under this paragraph total in excess of the estimated cost of completing the Work as of such date, as determined by EPA; except that if

Primary Settling Defendant's performance guarantee deposit is less than the estimated cost of completing the Work as of such date, EPA may retain a portion of the funds provided by Rio Tinto AUM under this Paragraph that is equal to the difference between the estimated cost of completing the Work as of such date and Primary Settling Defendant's performance guarantee deposit. All EPA Work Takeover costs not reimbursed under this Paragraph shall be reimbursed under Section XVI (Payments).

   49.   Modification of Amount and/or Form of Performance Guarantee.

      a.   Reduction of Amount of Performance Guarantee. If Primary Settling Defendant or Rio Tinto AUM believe that the estimated cost of completing the Work has diminished below the amounts set forth in Paragraph 43a. through 43.c., Primary Settling Defendant or Rio Tinto AUM may, on any anniversary of the Effective Date, after EPA determination of the completion of construction of the OU1 remedy, pursuant to the OU1 SOW paragraph XII.A.2, after EPA determination of the completion of construction of the OU2 remedy, pursuant to the OU2 SOW paragraph VII, or at any other time agreed to by the Parties, petition EPA in writing (with a copy to the Secondary Settling Defendants) to request a reduction in the amount of any performance guarantee provided pursuant to this Section so that the amount of that performance guarantee is equal to the estimated cost of completing the respective Work. Primary Settling Defendant or Rio Tinto AUM shall submit a written proposal for such reductions to EPA that shall specify, at a minimum, the estimated cost of completing the respective Work and the basis upon which such cost was calculated. In seeking approval for a reduction in the amount of a performance guarantee, Primary Settling Defendant or Rio Tinto AUM shall follow the procedures set forth in Paragraph 49.b(2) for requesting a revised or alternative form of performance guarantee, except as specifically provided in this Paragraph 49.a. If EPA decides to accept Primary Settling Defendant's or Rio Tinto AUM's proposal for a reduction in the amount of a performance guarantee, either to the amount set forth in Primary Settling Defendant's or Rio Tinto AUM's written proposal or to some other amount as selected by EPA, EPA will notify Primary Settling Defendant or Rio Tinto AUM of such decision in writing (with a copy to the Secondary Settling Defendants). Upon EPA's acceptance of a reduction in the amount of a performance guarantee, the Estimated Cost of the OU1 Work, the Estimated Cost of the OU2 Work, or the Estimated Cost of the OU3 Work, whichever may be the subject of Primary Settling Defendant's or Rio Tinto AUM's petition under this Paragraph, shall be deemed to be the estimated cost of completing the OU1 Work, OU2 Work or OU3 Work set forth in EPA's written decision. After receiving EPA's written decision, Primary Settling Defendant or Rio Tinto AUM may reduce the amount of the relevant performance guarantee in accordance with and to the extent permitted by such written acceptance and shall submit copies of all executed and/or otherwise finalized instruments or other documents required in order to make the selected performance guarantees legally binding in accordance with Paragraph 49.b(2). In the event of a dispute, Primary Settling Defendant or Rio Tinto AUM may reduce the amount of the performance guarantee required hereunder only in accordance with a final administrative or judicial decision resolving such dispute pursuant to Section XIX (Dispute Resolution). No change to the form or terms of any performance guarantee provided under this Section, other than a reduction in amount, is authorized except as provided in Paragraphs 47 or 49.b.

      b.   Change of Form of Performance Guarantee.

(1)   If, after the Effective Date, Primary Settling Defendant or Rio Tinto AUM desires to change the form or terms of any performance guarantees provided pursuant to this Section, Primary Settling Defendant or Rio Tinto AUM may, on any anniversary of the Effective Date, or at any other time agreed to by the Parties, petition EPA in writing (with a copy to the Secondary Settling Defendants) to request a change in the form or terms of the performance guarantee provided hereunder to any other liquid mechanism listed in Paragraphs 45.a through 45.c. The submission of such proposed revised or alternative performance guarantee shall be as provided in Paragraph 49.b(2). Any decision made by EPA on a petition submitted under this Paragraph shall be made in EPA's sole and unreviewable discretion, and such decision shall not be subject to challenge by Primary Settling Defendant or Rio Tinto AUM pursuant to the dispute resolution provisions of this Consent Decree or in any other forum.

(2)   If Primary Settling Defendant or Rio Tinto AUM desire to change the form of any performance guarantee issued under this Section, Primary Settling Defendant or Rio Tinto AUM shall submit a written proposal for a revised or alternative performance guarantee to EPA (with a copy to the Secondary Settling Defendants) that shall specify, at a minimum, the estimated cost of completing the respective Work, the basis upon which such cost was calculated, and the proposed revised performance guarantee, including all proposed instruments or other documents required in order to make the proposed performance guarantee legally binding. Any proposed revised or alternative performance guarantee must satisfy all requirements set forth or incorporated by reference in this Section. Primary Settling Defendant or Rio Tinto AUM shall submit such proposed revised or alternative performance guarantee to the EPA Regional Financial Management Officer and the Office of Regional Counsel in accordance with Section XXVII (Notices and Submissions). EPA will notify Primary Settling Defendant or Rio Tinto AUM in writing of its decision to accept or reject a revised or alternative performance guarantee submitted pursuant to this Paragraph (with a copy to the Secondary Settling Defendants). Within ten days after receiving a written decision approving the proposed revised or alternative performance guarantee, Primary Settling Defendant or Rio Tinto AUM shall execute and/or otherwise finalize all instruments or other documents required in order to make the selected performance guarantees legally binding in a form substantially identical to the documents submitted to EPA as part of the proposal, and such performance guarantees shall thereupon be fully effective. Primary Settling Defendant or Rio Tinto AUM shall submit copies of all executed and/or otherwise finalized instruments or other documents required in order to make the selected performance guarantee(s) legally binding to the EPA Regional Financial Management Officer within 30 days after receiving a written decision approving the proposed revised or alternative performance guarantee in accordance with Section XXVII (Notices and Submissions), with a copy to the United States and EPA as specified in Section XXVII.

c.     Release of Performance Guarantee. Neither Primary Settling Defendant nor Rio Tinto AUM shall release, cancel, or discontinue any performance guarantee provided

pursuant to this Section except as provided in this Paragraph.  If Primary Settling Defendant or Rio Tinto AUM receive written notice from EPA in accordance with Paragraph 51 that the Work has been fully and finally completed in accordance with the terms of this Consent Decree, or if EPA otherwise so notifies Primary Settling Defendant or Rio Tinto AUM in writing (with a copy to the Secondary Settling Defendants), Primary Settling Defendant or Rio Tinto AUM may thereafter release, cancel, or discontinue the performance guarantee(s) provided pursuant to this Section.  In the event of a dispute, Primary Settling Defendant or Rio Tinto AUM may release, cancel, or discontinue the performance guarantees required hereunder only in accordance with a final administrative or judicial decision resolving such dispute pursuant to Section XIX (Dispute Resolution).

## XIV.   CERTIFICATION OF COMPLETION

50.     <u>Completion of the Response Actions.</u>

a.      <u>Completion of the OU1 Remedial Action.</u>

(1)    Within 90 days after Primary Settling Defendant concludes that the OU1 Remedial Action has been fully performed and the Performance Standards set forth in the OU1 ROD have been achieved, Primary Settling Defendant shall schedule and conduct a pre-certification inspection to be attended by Primary Settling Defendant and  EPA.  If, after the pre-certification inspection, Primary Settling Defendant still believes that the OU1 Remedial Action has been fully performed and the Performance Standards set forth in the OU1 ROD have been achieved, it shall submit a written report requesting certification to EPA for approval, with a copy to the State and the Secondary Settling Defendants, pursuant to Section XI (EPA Approval of Plans, Reports, and Other Deliverables) within 30 days after the inspection.  In the report, a registered professional engineer and Primary Settling Defendant's OU1 Project Coordinator shall state that the OU1 Remedial Action has been completed in full satisfaction of the requirements of this Consent Decree.  The written report shall include as-built drawings signed and stamped by a professional engineer.  The report shall contain the following statement, signed by a responsible corporate official of Primary Settling Defendant or Primary Settling Defendant's OU1 Project Coordinator ("Statement"):

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

(2)    If, after completion of the pre-certification inspection and receipt and review of the written report, EPA, after reasonable opportunity for review and

comment by the State, determines that the OU1 Remedial Action or any portion thereof has not been completed in accordance with this Consent Decree or that the Performance Standards set forth in the OU1 ROD have not been achieved, EPA will notify Primary Settling Defendant in writing of the activities that must be undertaken by Primary Settling Defendant pursuant to this Consent Decree to complete the OU1 Remedial Action and achieve the Performance Standards set forth in the OU1 ROD. EPA will set forth in the notice a schedule for performance of such activities consistent with the Consent Decree and the OU1 SOW or require Primary Settling Defendant to submit a schedule to EPA for approval pursuant to Section XI (EPA Approval of Plans, Reports, and Other Deliverables). Primary Settling Defendant shall perform all activities described in the notice in accordance with the specifications and schedules established pursuant to this Paragraph, subject to its right to invoke the dispute resolution procedures set forth in Section XIX (Dispute Resolution).

(3)   If EPA concludes, based on the initial or any subsequent report requesting Certification of Completion of the OU1 Remedial Action and after a reasonable opportunity for review and comment by the State, that the OU1 Remedial Action has been performed in accordance with this Consent Decree and that the Performance Standards set forth in the OU1 ROD have been achieved, EPA will so certify in writing to Primary Settling Defendant (with a copy to the Secondary Settling Defendants).    Certification of Completion of the OU1 Remedial Action shall not affect Primary Settling Defendant's remaining obligations under this Consent Decree.

b.   Completion of the OU2 Remedial Action.

(1)   Within 90 days after Primary Settling Defendant concludes that the OU2 Remedial Action has been fully performed and the Performance Standards set forth in the OU2 ROD have been achieved, Primary Settling Defendant shall schedule and conduct a pre-certification inspection to be attended by Primary Settling Defendant and EPA. If, after the pre-certification inspection, Primary Settling Defendant still believes that the OU2 Remedial Action has been fully performed and the Performance Standards set forth in the OU2 ROD have been achieved, it shall submit a written report requesting certification to EPA for approval, with a copy to the State and the Secondary Settling Defendants, pursuant to Section XI (EPA Approval of Plans, Reports, and Other Deliverables) within 30 days after the inspection. In the report, a registered professional engineer and Primary Settling Defendant's OU2 Project Coordinator shall state that the OU2 Remedial Action has been completed in full satisfaction of the requirements of this Consent Decree. The written report shall include as-built drawings signed and stamped by a professional engineer. The report shall contain the Statement contained in paragraph 50.a(1), signed by a responsible corporate official of Primary Settling Defendant or Primary Settling Defendant's OU2 Project Coordinator.

(2)   If, after completion of the pre-certification inspection and receipt and review of the written report, EPA, after reasonable opportunity for review and

comment by the State, determines that the OU2 Remedial Action or any portion thereof has not been completed in accordance with this Consent Decree or that the Performance Standards set forth in the OU2 ROD have not been achieved, EPA will notify Primary Settling Defendant in writing of the activities that must be undertaken by Primary Settling Defendant pursuant to this Consent Decree to complete the OU2 Remedial Action and achieve the Performance Standards set forth in the OU2 ROD, provided, however, that EPA may only require Primary Settling Defendant to perform such activities pursuant to this Paragraph to the extent that such activities are consistent with the "scope of the remedy set forth in the ROD," as that term is defined in Paragraph 11.e(1). EPA will set forth in the notice a schedule for performance of such activities consistent with the Consent Decree and the OU2 SOW or require Primary Settling Defendant to submit a schedule to EPA for approval pursuant to Section XI (EPA Approval of Plans, Reports, and Other Deliverables). Primary Settling Defendant shall perform all activities described in the notice in accordance with the specifications and schedules established pursuant to this Paragraph, subject to their right to invoke the dispute resolution procedures set forth in Section XIX (Dispute Resolution).

(3)   If EPA concludes, based on the initial or any subsequent report requesting Certification of Completion of the OU2 Remedial Action and after a reasonable opportunity for review and comment by the State, that the OU2 Remedial Action has been performed in accordance with this Consent Decree and that the Performance Standards set forth in the OU2 ROD have been achieved, EPA will so certify in writing to Primary Settling Defendant (with a copy to the Secondary Settling Defendants).    Certification of Completion of the OU2 Remedial Action shall not affect Primary Settling Defendant's remaining obligations under this Consent Decree.

c.      Completion of the OU3 Remedial Action.

(1)   Within 90 days after Primary Settling Defendant concludes that the OU3 Remedial Action has been fully performed and the Performance Standards set forth in the OU3 ROD have been achieved, Primary Settling Defendant shall schedule and conduct a pre-certification inspection to be attended by Primary Settling Defendant and  EPA. If, after the pre-certification inspection, Primary Settling Defendant still believes that the OU3 Remedial Action has been fully performed and the Performance Standards set forth in the OU3 ROD have been achieved, it shall submit a written report requesting certification to EPA for approval, with a copy to the State and the Secondary Settling Defendants, pursuant to Section XI (EPA Approval of Plans, Reports, and Other Deliverables) within 30 days after the inspection.  In the report, a registered professional engineer and Primary Settling Defendant's OU3 Project Coordinator shall state that the OU3 Remedial Action has been completed in full satisfaction of the requirements of this Consent Decree.  The written report shall include as-built drawings signed and stamped by a professional engineer.  The report shall contain the Statement contained in paragraph 50.a(1), signed by a responsible corporate official of Primary Settling Defendant or Primary Settling Defendant's OU3 Project Coordinator.

(2)   If, after completion of the pre-certification inspection and receipt and review of the written report, EPA, after reasonable opportunity for review and comment by the State, determines that the OU3 Remedial Action or any portion thereof has not been completed in accordance with this Consent Decree or that the Performance Standards set forth in the OU3 ROD have not been achieved, EPA will notify Primary Settling Defendant in writing of the activities that must be undertaken by Primary Settling Defendant pursuant to this Consent Decree to complete the OU3 Remedial Action and achieve the Performance Standards set forth in the OU3 ROD, provided, however, that EPA may only require Primary Settling Defendant to perform such activities pursuant to this Paragraph to the extent that such activities are consistent with the "scope of the remedy set forth in the OU3 ROD," as that term is defined in Paragraph 12.f(1).  EPA will set forth in the notice a schedule for performance of such activities consistent with the Consent Decree and the OU3 SOW or require Primary Settling Defendant to submit a schedule to EPA for approval pursuant to Section XI (EPA Approval of Plans, Reports, and Other Deliverables).  Primary Settling Defendant shall perform all activities described in the notice in accordance with the specifications and schedules established pursuant to this Paragraph, subject to its right to invoke the dispute resolution procedures set forth in Section XIX (Dispute Resolution).

(3)   If EPA concludes, based on the initial or any subsequent report requesting Certification of Completion of the OU3 Remedial Action and after a reasonable opportunity for review and comment by the State, that the OU3 Remedial Action has been performed in accordance with this Consent Decree and that the Performance Standards set forth in the OU3 ROD have been achieved, EPA will so certify in writing to Primary Settling Defendant (with a copy to the Secondary Settling Defendants).  Certification of Completion of the OU3 Remedial Action shall not affect Primary Settling Defendant's remaining obligations under this Consent Decree.

d.   <u>Final Certification of Completion of Remedial Action.</u>

The certification of completion of remedial action that is last in time, regardless of operable unit, shall constitute the Final Certification of Completion of Remedial Action for purposes of this Consent Decree, including, but not limited to, Section XXI (Covenants by Plaintiff).

51.   <u>Completion of the Work.</u>

a.   Within 90 days after Primary Settling Defendant concludes that all phases of the Work, other than any remaining activities required under Section VII (Remedy Review), have been fully performed, Primary Settling Defendant shall schedule and conduct a pre-certification inspection to be attended by Primary Settling Defendant and EPA.  If, after the pre-certification inspection, Primary Settling Defendant still believes that the Work has been fully performed, Primary Settling Defendant shall submit to EPA (with a copy to the Secondary Settling Defendants) a written report by a registered professional engineer stating that the Work has been completed in full satisfaction of the requirements of this Consent Decree.  The report shall contain the Statement set forth in Paragraph 50.a(1), signed by a responsible corporate

43

official of Primary Settling Defendant or Primary Settling Defendant's Project Coordinator. If, after review of the written report, EPA, after reasonable opportunity for review and comment by the State, determines that any portion of the Work has not been completed in accordance with this Consent Decree, EPA will notify Primary Settling Defendant in writing of the activities that must be undertaken by Primary Settling Defendant pursuant to this Consent Decree to complete the Work, provided, however, that, with respect to OU2 and OU3, EPA may only require Primary Settling Defendant to perform such activities pursuant to this Paragraph to the extent that such activities are consistent with the scope of the remedies set forth in the OU2 ROD and the OU3 ROD, as defined in Paragraphs 11.e(1), and 12.e(1). EPA will set forth in the notice a schedule for performance of such activities consistent with the Consent Decree and the OU2 SOW or require Primary Settling Defendant to submit a schedule to EPA for approval pursuant to Section XI (EPA Approval of Plans, Reports, and Other Deliverables). Primary Settling Defendant shall perform all activities described in the notice in accordance with the specifications and schedules established therein, subject to its right to invoke the dispute resolution procedures set forth in Section XIX (Dispute Resolution).

b.      If EPA concludes, based on the initial or any subsequent request for Certification of Completion of the Work by Primary Settling Defendant, that the Work has been performed in accordance with this Consent Decree, EPA will so notify Primary Settling Defendant in writing (with a copy to the Secondary Settling Defendants).

## XV.   EMERGENCY RESPONSE

52.     If any action or occurrence during the performance of the Work causes or threatens a release of Waste Material from the Site that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, Primary Settling Defendant shall, subject to Paragraph 53, immediately take all appropriate action to prevent, abate, or minimize such release or threat of release, and shall immediately notify the relevant EPA Project Coordinator, or, if the Project Coordinator is unavailable, the relevant EPA Alternate Project Coordinator. If neither of these persons is available, Primary Settling Defendant shall notify the EPA Emergency Response Unit, Region 2. Primary Settling Defendant shall take such actions in consultation with the relevant EPA Project Coordinator or other available authorized EPA officer and in accordance with all applicable provisions of the Health and Safety Plans, the Contingency Plans, and any other applicable plans or documents developed pursuant to the relevant SOW. In the event that Primary Settling Defendant fails to take appropriate response action as required by this Section, and EPA takes such action instead, Primary Settling Defendant shall reimburse EPA all costs of the response action under Section XVI (Payments).

53.     Subject to Section XXI (Covenants by Plaintiff), nothing in the preceding Paragraph or in this Consent Decree shall be deemed to limit any authority of the United States (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or (b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site.

44

## XVI.   PAYMENTS

54.     Payment by Settling Defendants for Past Response Costs and Civil Penalty.

a.      Within 10 days after the Effective Date, Settling Defendants shall pay to EPA $25,000,000 in payment for Past Response Costs.  Payment shall be made in accordance with Paragraph 57.a (Instructions for Past Response Costs Payments).

b.      Within 30 days after the Effective Date, Primary Settling Defendant shall pay a civil penalty of $281,899 to resolve past alleged violations of the OU1 UAO.  Payment shall be made in accordance with instructions to be provided by the Department of Justice.

55.     The total amount to be paid by Settling Defendants pursuant to Paragraph 54.a shall be deposited by EPA in the Pohatcong Valley Groundwater Contamination Superfund Site Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

56.     Payments by Primary Settling Defendant for Future Response Costs.

a.      Primary Settling Defendant shall pay to EPA all Future Response Costs not inconsistent with the NCP, as set forth in the Stipulation and Order (Docket Entry No. 100), attached hereto as Appendix G.

b.      On a periodic basis, EPA will send Primary Settling Defendant a bill requiring payment that includes a SCORPIOS Report, which includes direct and indirect costs incurred by EPA, its contractors, and DOJ.  Primary Settling Defendant shall make all payments within 30 days after Primary Settling Defendant's receipt of each bill requiring payment, except as otherwise provided in Paragraph 58, in accordance with Paragraph 57.b (Instructions for Future Response Cost Payments).

c.      The total amount to be paid by Primary Settling Defendant pursuant to this Paragraph 56 shall be deposited by EPA in the Pohatcong Valley Groundwater Contamination Superfund Site Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

57.     Payment Instructions for Settling Defendants.

a.      Instructions for Past Response Costs Payments.  All payments required, elsewhere in this Consent Decree, to be made in accordance with this Paragraph shall be made in accordance with instructions provided to Settling Defendants by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the District of New Jersey after the Effective Date.  The payment instructions provided by the Financial Litigation Unit shall include a Consolidated Debt Collection System ("CDCS") number, which shall be used to identify all payments required to be made in accordance with this Consent Decree.  The FLU shall provide the payment instructions to:

On behalf of Primary Settling Defendant

    Bruce White, Esq.
    Barnes & Thornburg LLP
    One North Wacker Drive, Suite 4400
    Chicago, IL 60606-2833
    (312) 214-4584
    Bruce.White@btlaw.com

    and
    Lauren M. Piana
    Corporate Counsel
    Rio Tinto AUM Services, Inc.
    4700 Daybreak Parkway
    South Jordan, UT 84095
    801-204-2715
    Lauren.Piana@riotinto.com

On behalf of Secondary Settling Defendants.

    Albéa Americas, Inc., Roy Turner
    President
    Albéa Americas, Inc.
    1209 Madison Street
    Shelbyville, TN 37160
    (931) 685-6236
    Roy.Turner@albea-group.com

    and

    Christian C. Semonsen, Esq.
    Kirkland & Ellis LLP
    655 15th Street, N.W.
    Washington, D.C. 20005
    (202) 879-5076
    csemonsen@kirkland.com

Bristol-Myers Squibb Company,

    Katherine R. Kelly, Esq.
    Vice President, Assistant General Counsel & Assistant Secretary
    Bristol-Myers Squibb Company
    345 Park Avenue
    New York, NY 10154
    (212) 546-4852
    Katherine.kelly@bms.com
    and

J. Richard Pooler, Jr., Esq.
Assistant General Counsel – EHS
Bristol-Myers Squibb Company
6000 Thompson Road
East Syracuse, NY 13057
(315) 432-2774
james.pooler@bms.com

and

Glen R. Stuart, Esq.
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5883
gstuart@morganlewis.com

Citigroup Inc. and MRC Holdings, Inc.

John Preston Turner, Esq.
Associate General Counsel
Citi Litigation Service Center
300 St. Paul Place, 15th Fl.
Baltimore, MD 21202
(410) 332-3687
john.preston.turner@citi.com

and

David J. Freeman, Esq.
Gibbons P.C.
1 Pennsylvania Plaza, 37th Floor
New York, NY 10119-3701
(212) 613-2079
dfreeman@gibbonslaw.com

Rexam Beverage Can Company.

Joshua R. Markus, Esq.
General Counsel
Rexam Inc. and Subsidiaries
8770 West Bryn Mawr, Suite 175
Chicago, IL 60631
Joshua.Markus@rexam.com

47

Settling Defendants may change the individual to receive payment instructions on its behalf by providing written notice of such change in accordance with Section XXVII (Notices and Submissions).  When making payments under this Paragraph 57.a., Settling Defendants shall also comply with Paragraph 57.c.

    b.  <u>Instructions for Future Response Costs Payments and Stipulated</u> Penalties. All payments required, elsewhere in this Consent Decree, to be made in accordance with this Paragraph 57.b shall be made by Fedwire EFT to:

Federal Reserve Bank of New York
ABA = 021030004
Account = 68010727
SWIFT address = FRNYUS33
33 Liberty Street
New York NY 10045
Field Tag 4200 of the Fedwire message should read "D 68010727 Environmental
Protection Agency"

When making payments under this Paragraph 57.b, Settling Defendants shall also comply with
Paragraph 57.c.

    c.  <u>Instructions for All Payme</u>nts.  All payments made under Paragraphs 57.a
(Instructions for Past Response Cost Payments) or 57.b (Instructions for Future Response Cost
Payments) and Stipulated Penalties shall reference the CDCS Number, Site/Spill ID Number
NJD981179047 and DOJ Case Numbers 90-11-3-09051 and 90-11-3-09051/1.  At the time of
any payment required to be made in accordance with Paragraphs 57.a or 57.b, the remitting
Settling Defendant shall send notice that payment has been made to the United States, and to
EPA, in accordance with Section XXVII (Notices and Submissions), and to the EPA Cincinnati
Finance Office by email at cinwd_acctsreceivable@epa.gov, or by mail at 26 W. Martin Luther
King Drive, Cincinnati, Ohio 45268.  Such notice shall also reference the CDCS Number,
Site/Spill ID Number, and DOJ Case Numbers.

    58.  As set forth in Paragraph 18 of the Stipulation and Order, Civ. 09-cv-05692,
Docket Entry 100, attached hereto as Appendix G, Primary Settling Defendant may contest any
Future Response Costs billed under Paragraph 56 (Payments by Primary Settling Defendant for
Future Response Costs) if the individual cost in question arises from fraud, double-billing,
activities that do not relate to the selected remedy, or on other grounds allowed by applicable
case law, consistent with *United States v. Kramer*, 913 F. Supp. 848, 867 (D.N.J. 1995) and
*United States v. Hardage*, 982 F.2d 1436 (10th Cir. 1992). Such objection shall be made in
writing within 30 days after receipt of the bill and must be sent to the United States pursuant to
Section XXVII (Notices and Submissions).  Any such objection shall specifically identify the
contested Future Response Costs and the basis for objection.  In the event of an objection,
Primary Settling Defendant shall pay all uncontested Future Response Costs to the United States
within 30 days after Primary Settling Defendant's receipt of the bill requiring payment.
Simultaneously, Primary Settling Defendant shall establish, in a duly chartered bank or trust
company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance
Corporation ("FDIC"), and remit to that escrow account funds equivalent to the amount of the
contested Future Response Costs.  Primary Settling Defendant shall send to the United States, as
provided in Section XXVII (Notices and Submissions), a copy of the transmittal letter and check
paying the uncontested Future Response Costs, and a copy of the correspondence that establishes
and funds the escrow account, including, but not limited to, information containing the identity
of the bank and bank account under which the escrow account is established as well as a bank
statement showing the initial balance of the escrow account.  Simultaneously with establishment
of the escrow account, Primary Settling Defendant shall initiate the Dispute Resolution
procedures in Section XIX (Dispute Resolution).  If the United States prevails in the dispute,
Primary Settling Defendant shall pay the sums due (with accrued interest) to the United States

within five days after the resolution of the dispute.  If Primary Settling Defendant prevails concerning any aspect of the contested costs, Primary Settling Defendant shall pay that portion of the costs (plus associated accrued interest) for which it did not prevail to the United States within five days after the resolution of the dispute.  Primary Settling Defendant shall be disbursed any balance of the escrow account.  All payments to the United States under this Paragraph shall be made in accordance with Paragraphs 57.b (Instructions for Future Response Cost Payments).  The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XIX (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding Primary Settling Defendant's obligation to reimburse the United States for its Future Response Costs.

59.   Interest.  In the event that any payment for Past Response Costs or for Future Response Costs required under this Section is not made by the date required, Primary Settling Defendant shall pay Interest on the unpaid balance.  The Interest to be paid on Past Response Costs under this Paragraph shall begin to accrue on the Effective Date.  The Interest on Future Response Costs shall begin to accrue on the date of the bill.  The Interest shall accrue through the date of Primary Settling Defendant's payment.  Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to Plaintiff by virtue of Primary Settling Defendant's failure to make timely payments under this Section including, but not limited to, payment of stipulated penalties pursuant to Paragraph 74.

## XVII.   INDEMNIFICATION AND INSURANCE

60.   Settling Defendants' Indemnification of the United States.

a.   The United States does not assume any liability by entering into this Consent Decree or by virtue of any designation of Settling Defendants as EPA's authorized representatives under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e).  Both Primary Settling Defendant and Rio Tinto AUM shall indemnify, save and hold harmless the United States and its officials, agents, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of Primary Settling Defendant, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on their behalf or under their control, in carrying out activities pursuant to this Consent Decree, including, but not limited to, any claims arising from any designation of Primary Settling Defendant as EPA's authorized representatives under Section 104(e) of CERCLA.  After any Work Takeover pursuant to Paragraph 89, Secondary Settling Defendants shall indemnify, save and hold harmless the United States and its officials, agents, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of Secondary Settling Defendants, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on their behalf or under their control, in carrying out activities pursuant to this Consent Decree, including, but not limited to, any claims arising from any designation of Secondary Settling Defendants as EPA's authorized representatives under Section 104(e) of CERCLA.  Further, (1) Primary Settling Defendant and Rio Tinto AUM agree to pay the United States all costs it incurs including, but not limited to, attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the

United States based on negligent or other wrongful acts or omissions of Primary Settling Defendant, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on its behalf or under their control, in carrying out activities pursuant to this Consent Decree; and (2) after any Work Takeover pursuant to Paragraph 89, Secondary Settling Defendants agree to pay the United States all costs it incurs including, but not limited to, attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States based on negligent or other wrongful acts or omissions of Secondary Settling Defendants, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on their behalf or under their control, in carrying out activities pursuant to this Consent Decree. The United States shall not be held out as a party to any contract entered into by or on behalf of Settling Defendants in carrying out activities pursuant to this Consent Decree. Neither Settling Defendants nor any such contractor shall be considered an agent of the United States.

        b.      The United States shall give Settling Defendants notice of any claim for which the United States plans to seek indemnification pursuant to this Paragraph 60, and shall consult with Settling Defendants prior to settling such claim.

        61.      Settling Defendants covenant not to sue and agree not to assert any claims or causes of action against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States, arising from or on account of any contract, agreement, or arrangement between any one or more of Settling Defendants and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, (a) Primary Settling Defendant shall indemnify and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between Primary Settling Defendant and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays; and (b) after any Work Takeover pursuant to Paragraph 89, Secondary Settling Defendants shall indemnify and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between any one or more of the Settling Defendants and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

        62.      No later than 15 days before commencing any on-site Work, Primary Settling Defendant shall secure, and shall maintain until the first anniversary after the issuance of the Final Certification of Completion of the Remedial Action pursuant to Paragraph 50.d of Section XIV (Certification of Completion), commercial general liability insurance with limits of 20 million dollars, for any one occurrence, and automobile liability insurance with limits of 5 million dollars, combined single limit, naming the United States as an additional insured with respect to all liability arising out of the activities performed by or on behalf of Primary Settling Defendant pursuant to this Consent Decree. In addition, for the duration of this Consent Decree, Primary Settling Defendant shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Primary Settling Defendant in furtherance of this Consent Decree. Prior to commencement of the Work under this Consent

Decree, Primary Settling Defendant shall provide to EPA and all Secondary Settling Defendants certificates of such insurance. Primary Settling Defendant shall resubmit such certificates each year on the anniversary of the Effective Date. Primary Settling Defendant shall retain complete copies of the applicable insurance policies in accordance with Section XXVI (Retention of Records). In the event that a claim is made against the United States, on its request, Primary Settling Defendant shall produce copies of the complete, unredacted insurance policies, for which Primary Settling Defendant may seek treatment as Confidential Business Information, in accordance with 40 C.F.R. Part 2. If Primary Settling Defendant demonstrates by evidence satisfactory to EPA and all Secondary Settling Defendants that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, Primary Settling Defendant need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor.

## XVIII. FORCE MAJEURE

63. "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Primary Settling Defendant, of any entity controlled by Primary Settling Defendant, or of Primary Settling Defendant's contractors that delays or prevents the performance of any obligation under this Consent Decree despite Primary Settling Defendant's best efforts to fulfill the obligation. The requirement that Primary Settling Defendant exercises "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards.

64. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree for which Primary Settling Defendant intends or may intend to assert a claim of force majeure, Primary Settling Defendant shall notify the appropriate EPA Project Coordinator orally or, in his or her absence, the appropriate EPA Alternate Project Coordinator or, in the event both of EPA's designated representatives are unavailable, the Director of the Emergency and Remedial Response Division, EPA Region 2, within 48 hours of when Primary Settling Defendant first knew that the event might cause a delay. Within 5 days thereafter, Primary Settling Defendant shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Primary Settling Defendant's rationale for attributing such delay to a force majeure; and a statement as to whether, in the opinion of Primary Settling Defendant, such event may cause or contribute to an endangerment to public health or welfare, or the environment. Primary Settling Defendant shall include with any notice all available documentation supporting its claim that the delay was attributable to a force majeure. Primary Settling Defendant shall be deemed to know of any circumstance of which Primary Settling Defendant, any entity controlled by Primary Settling Defendant, or Primary Settling Defendant's contractors knew or should have known. Failure to comply with

the above requirements regarding an event shall preclude Primary Settling Defendant from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late notice, is able to assess to its satisfaction whether the event is a force majeure under Paragraph 63 and whether Primary Settling Defendant has exercised its best efforts under Paragraph 63, EPA may, in its unreviewable discretion, excuse in writing Primary Settling Defendant's failure to submit timely notices under this Paragraph.

65.    If EPA agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this Consent Decree that are affected by the force majeure will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation. If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify Primary Settling Defendant in writing of its decision. If EPA agrees that the delay is attributable to a force majeure, EPA will notify Primary Settling Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

66.    If Primary Settling Defendant elects to invoke the dispute resolution procedures set forth in Section XIX (Dispute Resolution), it shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, Primary Settling Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Primary Settling Defendant complied with the requirements of Paragraphs 63 and 64. If Primary Settling Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Primary Settling Defendant of the affected obligation of this Consent Decree identified to EPA and the Court.

## XIX.   DISPUTE RESOLUTION

67.    Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes regarding this Consent Decree. However, the procedures set forth in this Section shall not apply to actions by the United States to enforce obligations of Primary Settling Defendant that have not been disputed in accordance with this Section.

68.    Any dispute regarding this Consent Decree shall in the first instance be the subject of informal negotiations between the parties to the dispute. The period for informal negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute. The dispute shall be considered to have arisen when one Party sends the other Parties a written Notice of Dispute.

69.    Statements of Position.

a.    In the event that the parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA shall be considered binding unless, within 14 days after the conclusion of the informal negotiation period,

53

Settling Defendants invoke the formal dispute resolution procedures of this Section by serving on the United States a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by Settling Defendants. The Statement of Position shall specify Settling Defendants' position as to whether formal dispute resolution should proceed under Paragraph 70 (Record Review) or Paragraph 71.

b.      Within 30 days after receipt of Settling Defendants' Statement of Position, EPA will serve on Settling Defendants its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA. EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under Paragraph 70 (Record Review) or Paragraph 71. Within 14 days after receipt of EPA's Statement of Position, Settling Defendants may submit a Reply.

c.      If there is disagreement between EPA and Settling Defendants as to whether dispute resolution should proceed under Paragraph 70 (Record Review) or Paragraph 71, the parties to the dispute shall follow the procedures set forth in the paragraph determined by EPA to be applicable. However, if Settling Defendants ultimately appeal to the Court to resolve the dispute, the Court shall determine which paragraph is applicable in accordance with the standards of applicability set forth in Paragraphs 70 and 71.

70.      Record Review. Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, including any disputes under Paragraph 89 relating to Work Takeover and those disputes contemplated in Paragraph 20 of the Stipulation and Order, 09-cv-05692, Docket Entry 100, attached hereto as Appendix G, shall be conducted pursuant to the procedures set forth in this Paragraph. For purposes of this Paragraph, the adequacy of any response action includes, without limitation, the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this Consent Decree, and the adequacy of the performance of response actions taken pursuant to this Consent Decree. As set forth in Paragraph 19 of the Stipulation and Order, 09-cv-05692, Docket Entry 100, attached hereto as Appendix G, Settling Defendants will not dispute pursuant to this Section, nor will they seek judicial review of: (a) EPA's remedy selection for OU1 as documented in the OU1 ROD or the validity of the OU1 RODs provisions; (b) EPA's remedy selection for OU2 as documented in the OU2 ROD or the validity of the OU2 RODs provisions; (c) EPA's response action selection for any Vapor Intrusion removal action at the Washington Facility, including the 2013 Vapor Intrusion Removal Action; and (d) EPA's response action selection for the Vapor Intrusion Removal Action, as documented in the Action Memorandum, dated September 27, 2006, and the 2009 Action Memorandum Request for Restart and Ceiling Increase, dated July 1, 2009. As set forth in Paragraph 20 of the Stipulation and Order, 09-cv-05692, Docket Entry 100, attached hereto as Appendix G, Settling Defendants specifically reserve the right to dispute, challenge and seek judicial review of (a) EPA's remedy selection for OU3 after EPA issues any Record of Decision for OU3; (b) EPA's remedy selection for any further operable unit EPA may designate at the Site after entry of this Consent Decree; and (c) EPA's selection of any response actions (removal or remedial), outside the scope of those actions referenced in the preceding sentence, which EPA may take at the Site after the entry of

this Consent Decree.  Nothing in this Consent Decree shall be construed to allow any dispute by Settling Defendants regarding the validity of a ROD's provisions, except as set forth in Paragraph 20 of the Stipulation and Order and Paragraph 87.a of this Consent Decree concerning OU3.

a.       An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position, including supporting documentation, submitted pursuant to this Section.  Where appropriate, EPA may allow submission of supplemental statements of position by the parties to the dispute.

b.       The Director of the Emergency and Remedial Response Division, EPA Region 2, will issue a final administrative decision resolving the dispute based on the administrative record described in Paragraph 70.a.  This decision shall be binding upon Settling Defendants, subject only to the right to seek judicial review pursuant to Paragraphs 70.c and 70.d.

c.       Any administrative decision made by EPA pursuant to Paragraph 70.b shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by Settling Defendants with the Court and served on all Parties within ten days after receipt of EPA's decision.  The motion shall include a description of the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this Consent Decree.  The United States may file a response to Settling Defendants' motion.

d.       In proceedings on any dispute governed by this Paragraph, Settling Defendants shall have the burden of demonstrating that the decision of the Emergency and Remedial Response Division Director is arbitrary and capricious or otherwise not in accordance with law.  Judicial review of EPA's decision shall be on the administrative record compiled pursuant to Paragraph 70.a.

71.       Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law, shall be governed by this Paragraph.

a.       Following receipt of Settling Defendants' Statement of Position submitted pursuant to Paragraph 69, the Director of the Emergency and Remedial Response Division, EPA Region 2, will issue a final decision resolving the dispute.  The Emergency and Remedial Response Division Director's decision shall be binding on Settling Defendants unless, within ten days after receipt of the decision, Settling Defendants file with the Court and serve on the Parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the Consent Decree.  The United States may file a response to Settling Defendants' motion.

b.       Notwithstanding Paragraph Z (CERCLA Section 113(j) Record Review of ROD and Work) of Section I (Background), judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

72.     The invocation of formal dispute resolution procedures under this Section shall not extend, postpone, or affect in any way any obligation of Settling Defendants under this Consent Decree, not directly in dispute, unless EPA or the Court agrees otherwise.  Stipulated penalties with respect to the disputed matter shall continue to accrue but payment shall be stayed pending resolution of the dispute as provided in Paragraph 81.  Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this Consent Decree.  In the event that Settling Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XX (Stipulated Penalties).

## XX.   STIPULATED PENALTIES

73.     Primary Settling Defendant shall be liable for stipulated penalties in the amounts set forth in Paragraphs 74 and 75 to the United States for failure to comply with the requirements of this Consent Decree specified below, unless excused under Section XVIII (Force Majeure).  "Compliance" by Primary Settling Defendant shall include completion of all payments and activities required under this Consent Decree, or any plan, report, or other deliverable approved under this Consent Decree, in accordance with all applicable requirements of law, this Consent Decree, the SOW, and any plans, reports, or other deliverables approved under this Consent Decree and within the specified time schedules established by and approved under this Consent Decree.

74.     <u>Stipulated Penalty Amounts - Work and Payment</u>s.

a.      To further resolve alleged past violations of the OU1 UAO, Primary Settling Defendant agrees to pay a $750,000 penalty within 30 days of receipt of a written demand by EPA if Primary Settling Defendant fails to timely commence full scale extraction/treatment/discharge of the OU1 RA, as set forth in the Schedule for the OU1 Remedial Design/Remedial Action, unless otherwise modified by EPA, attached hereto as Appendix E.  Notwithstanding any other provision of this Consent Decree, Secondary Settling Defendants shall not be required to pay the amount due under this Paragraph 74.a.

b.      The following stipulated penalties shall accrue per violation per day for any noncompliance identified in Paragraph 74.c:

| Period of Noncompliance | Primary Settling Defendant Penalty Per Violation, Per Day | Secondary Settling Defendants Penalty Per Violation, Per Day |
|---|---|---|
| 1st through 14th day | $7,500 | $3,750 |
| 15th through 30th day | $10,000 | $5,000 |
| 31st day and beyond | $15,000 | $7,500 |

c.      <u>Compliance Milestones (excluding plans, reports and other deliverables)</u>.

(1)    Timely payment for Past Response Costs and for Future Response Costs pursuant to Section XVI (Payments);

(2)     Timely provision of any performance guarantee required pursuant to Section XIII;

(3)     Timely completion of the OU1 Remedial Design in accordance with the OU1 ROD, the OU1 SOW, or this Consent Decree, and plans and schedules approved thereunder;

(4)     Timely initiation of construction of the OU1 Remedial Action or implementation of OU1 Operation and Maintenance in accordance with the OU1 ROD, the OU1 SOW, or this Consent Decree, and plans and schedules approved thereunder;

(5)     Timely initiation and completion of construction of the OU2 Remedial Action or timely implementation of OU2 Operation and Maintenance in accordance with the OU2 ROD, the OU2 SOW, or this Consent Decree, and plans and schedules approved thereunder;

(6)     Timely completion of the OU3 Remedial Design, initiation or completion of construction of the OU3 Remedial Action, or implementation of OU3 Operation and Maintenance in accordance with the OU3 ROD, the OU3 SOW, or this Consent Decree, and plans and schedules approved thereunder; and

(7)     Timely completion of the 2013 Vapor Intrusion Removal Action in accordance with the Vapor Intrusion SOW, and plans and schedules approved thereunder.

75.     Stipulated Penalty Amounts - Other Requirements (including plans, reports and other deliverables).  The following stipulated penalties shall accrue per violation per day for any noncompliance with a requirement of this Consent Decree not identified in Paragraph 74.c of this Consent Decree, including failure to submit timely or adequate reports or other plans or deliverables pursuant to the Consent Decree:

| Period of Noncompliance | Primary Settling Defendant Penalty Per Violation, Per Day | Secondary Settling Defendants Penalty Per Violation, Per Day |
|---|---|---|
| 1st through 14th day | $5,000 | $2,500 |
| 15th through 30th day | $7,500 | $3,750 |
| 31st day and beyond | $10,000 | $5,000 |

76.     Secondary Settling Defendants shall not be liable for any stipulated penalty amount accrued under Paragraphs 74, 75 or 77 as a result of any violation or noncompliance, or alleged violation or noncompliance, of Primary Settling Defendant.

77.     In the event of a Work Takeover from Primary Settling Defendant pursuant to Paragraph 89 (Work Takeover), the Primary Settling Defendant shall be liable for a stipulated penalty in the amount of $7,500,000. In the event of a Work Takeover from Secondary Settling Defendants pursuant to Paragraph 89 (Work Takeover), Secondary Settling Defendants shall be

liable for a stipulated penalty in the amount of $2,000,000. Stipulated penalties under this paragraph are in addition to the remedies available under Paragraphs 48 (Funding for Work Takeover) and 89 (Work Takeover).

78.     All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: (a) with respect to a deficient submission under Section XI (EPA Approval of Plans, Reports, and Other Deliverables), during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies Primary Settling Defendant of any deficiency; (b) with respect to a decision by the Director of the Emergency and Remedial Response Division, EPA Region 2, under Paragraph 70.b or 71.a of Section XIX (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that Primary Settling Defendant's reply to EPA's Statement of Position is received until the date that the Director issues a final decision regarding such dispute; or (c) with respect to judicial review by this Court of any dispute under Section XIX (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute. Nothing in this Consent Decree shall prevent the simultaneous accrual of separate penalties for separate violations of this Consent Decree.

79.     Following EPA's determination that Primary Settling Defendant has failed to comply with a requirement of this Consent Decree, EPA may give Primary Settling Defendant written notification of the same and describe the noncompliance. EPA may send Primary Settling Defendant a written demand for the payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified Primary Settling Defendant of a violation.

80.     All penalties accruing under this Section shall be due and payable to the United States within 30 days after Primary Settling Defendant's receipt from EPA of a demand for payment of the penalties, unless Primary Settling Defendant invokes the Dispute Resolution procedures under Section XIX (Dispute Resolution) within the 30-day period. All payments to the United States under this Section shall indicate that the payment is for stipulated penalties and shall be made in accordance with Paragraph 57.b (Instructions for Future Response Cost Payments).

81.     Penalties shall continue to accrue as provided in Paragraph 78 during any dispute resolution period, but need not be paid until the following:

a.      If the dispute is resolved by agreement of the Parties or by a decision of EPA that is not appealed to this Court, accrued penalties determined to be owed shall be paid to EPA within 15 days after the agreement or the receipt of EPA's decision or order;

b.      If the dispute is appealed to this Court and the United States prevails in whole or in part, Primary Settling Defendant shall pay all accrued penalties determined by the Court to be owed to EPA within 60 days after receipt of the Court's decision or order, except as provided in Paragraph 81.c;

c.      If the District Court's decision is appealed by any Party, Primary Settling Defendant shall pay all accrued penalties determined by the District Court to be owed to the United States into an interest-bearing escrow account, established at a duly chartered bank or trust company that is insured by the FDIC, within 60 days after receipt of the Court's decision or order. Penalties shall be paid into this account as they continue to accrue, at least every 60 days. Within 15 days after receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to EPA  or to Primary Settling Defendant to the extent that it prevails.

82.      If Primary Settling Defendant fails to pay stipulated penalties when due, Primary Settling Defendant shall pay Interest on the unpaid stipulated penalties as follows: (a) if Primary Settling Defendant has timely invoked dispute resolution such that the obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, Interest shall accrue from the date stipulated penalties are due pursuant to Paragraph 81 until the date of payment; and (b) if Primary Settling Defendant fails to timely invoke dispute resolution, Interest shall accrue from the date of demand under Paragraph 80 until the date of payment.  If Primary Settling Defendant fails to pay stipulated penalties and Interest when due, the United States may institute proceedings to collect the penalties and Interest.

83.      The payment of penalties and Interest, if any, shall not alter in any way Primary Settling Defendant's obligation to complete the performance of the Work required under this Consent Decree.

84.      Nothing in this Consent Decree shall be construed as prohibiting, altering, or in any way limiting the ability of the United States  to seek any other remedies or sanctions available by virtue of Settling Defendants' violation of this Consent Decree or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(*l*) of CERCLA, 42 U.S.C. § 9622(*l*), provided, however, that the United States shall not seek civil penalties pursuant to Section 122(*l*) of CERCLA for any violation for which a stipulated penalty is provided in this Consent Decree, except in the case of a willful violation of this Consent Decree.

85.      Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Consent Decree.

XXI.   COVENANTS BY PLAINTIFF

86.      <u>Covenants for Settling Defendants by United States</u>.  In consideration of the actions that will be performed and the payments that will be made by Settling Defendants under this Consent Decree, and except as specifically provided in Paragraphs 87 (United States' Specific Reservations), and 88 (General Reservations of Rights), the United States covenants not to sue or to take administrative action against Settling Defendants pursuant to Sections 106 and 107(a) of CERCLA, and against the Washington Facility pursuant to Section 107(*l*)of CERCLA relating to the Site, and against Pechiney Plastic Packaging, Inc., Bristol-Myers Squibb Company, Citigroup Inc., Myset Investment Company, MRC Holdings, Inc., and Rexam Beverage Can Company pursuant to Section 7003 of RCRA.  Except with respect to future liability, these covenants shall take effect upon the receipt by EPA of the payment required by

Paragraph 54 (Payments for Past Response Costs) and any Interest or stipulated penalties due thereon under Paragraph 59 (Interest) or Section XX (Stipulated Penalties). With respect to future liability, these covenants shall take effect upon the Final Certification of Completion of Remedial Action by EPA pursuant to Paragraph 50.d of Section XIV (Certification of Completion). These covenants are conditioned upon the satisfactory performance by each Settling Defendant and Rio Tinto AUM of their obligations under this Consent Decree. These covenants extend only to Settling Defendants, except as provided in the following sentence. These covenants not to sue and the contribution protection provisions of Section XXIII, shall also apply to Settling Defendants' officers, directors, employees, successors and assigns, but only to the extent that the alleged liability of the officer, director, employee, successor or assign is based on its status and in its capacity as an officer, director, employee, successor or assign of a Settling Defendant, and not to the extent that the alleged liability arose independently of the alleged liability of Settling Defendants. These covenants not to sue do not extend to any other person.

> 87.   United States' Specific Reservations.

> > a.   United States' Reservations Regarding OU3. Notwithstanding any other provision of this Consent Decree, the United States reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel Settling Defendants to perform further response actions relating to the area within OU3 that is beyond the geographic boundaries of the Washington Facility, as generally depicted on Map I, attached in Appendix C1, and/or to pay the United States for additional costs of response relating to the aforementioned area.

> > b.   United States' Pre-Certification Reservations. Notwithstanding any other provision of this Consent Decree, the United States reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel Settling Defendants to perform further response actions relating to the Site and/or to pay the United States for additional costs of response if, (a) prior to the Final Certification of Completion of the Remedial Action pursuant to Paragraph 50.d, (1) conditions at the Site, previously unknown to EPA, are discovered, or (2) information, previously unknown to EPA, is received, in whole or in part, and (b) EPA determines that these previously unknown conditions or information together with any other relevant information indicates that one or more of the Remedial Actions are not protective of human health or the environment.

> > c.   United States' Post-Certification Reservations. Notwithstanding any other provision of this Consent Decree, the United States reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel Settling Defendants to perform further response actions relating to the Site and/or to pay the United States for additional costs of response if, (a) subsequent to Final Certification of Completion of the Remedial Action pursuant to Paragraph 50.d, (1) conditions at the Site, previously unknown to EPA, are discovered, or (2) information, previously unknown to EPA, is received, in whole or in part, and (b) EPA determines that these previously unknown conditions or this information together with other

relevant information indicate that one or more of the Remedial Actions are not protective of human health or the environment.

        d.      For purposes of Paragraph 87.b (United States' Pre-Certification Reservations), the information and the conditions known to EPA will include only that information and those conditions known to EPA as of the date each relevant ROD for the Site was signed and set forth in that ROD and the administrative record supporting that ROD. For purposes of Paragraph 87.c (United States' Post-Certification Reservations), the information and the conditions known to EPA shall include only that information and those conditions known to EPA as of the date of Final Certification of Completion of the Remedial Action and set forth in the RODs, the administrative records supporting each ROD, the post-ROD administrative records, or in any information received by EPA pursuant to the requirements of this Consent Decree prior to Final Certification of Completion of the Remedial Action.

        88.      <u>General Reservations of Rights</u>. The United States reserves, and this Consent Decree is without prejudice to, all rights against Settling Defendants with respect to all matters not expressly included within Plaintiff's covenants. Notwithstanding any other provision of this Consent Decree, the United States reserves all rights against Settling Defendants with respect to:

        a.      liability for failure by any Settling Defendant to meet a requirement of this Consent Decree applicable to that Settling Defendant;

        b.      liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site;

        c.      liability based on the ownership of any portion of the Site by Settling Defendants when such ownership commences after signature of this Consent Decree by Settling Defendants;

        d.      liability based on the operation of any portion of the Site by Settling Defendants when such operation commences after signature of this Consent Decree by Settling Defendants and does not arise solely from Settling Defendants' performance of the Work;

        e.      liability based on Settling Defendants' transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, other than as provided in the RODs, the Work, or otherwise ordered by EPA, after signature of this Consent Decree by Settling Defendants;

        f.      liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

        g.      criminal liability;

        h.      liability for violations of federal or state law that occur during or after implementation of the Work; and

i.      liability, prior to the Final Certification of Completion of the Remedial Action, for additional response actions that EPA determines are necessary to achieve and maintain Performance Standards or to carry out and maintain the effectiveness of the remedies set forth in the OU1 ROD, the OU2 ROD,  the OU3 ROD, and the Vapor Intrusion SOW, but that cannot be required pursuant to Paragraphs 10.f, 11.e, 12.f, or 13.d (Modification of SOW or Related Work Plans).

89.    Work Takeover.

a.      In the event EPA determines that Primary Settling Defendant has (1) ceased implementation of any portion of the Work, or (2) is seriously or repeatedly deficient or late in its performance of the Work, or (3) is implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Work Takeover Notice") to Settling Defendants.  Any Work Takeover Notice issued by EPA will specify the grounds upon which such notice was issued and will provide Primary Settling Defendant a period of twenty-one days within which to remedy the circumstances giving rise to EPA's issuance of such notice.  Settling Defendants may invoke the procedures set forth in Paragraph 70 (Record Review), to dispute a Work Takeover under this Paragraph.

b.      If, after expiration of the twenty-one-day notice period specified in Paragraph 89.a, Primary Settling Defendant has not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, consistent with Paragraph 48 EPA may either:

(1)    assume the performance of all or any portion(s) of the Work as EPA deems necessary, using the funds placed in the Pohatcong Valley Groundwater Contamination Superfund Site Special Account to pay for such remaining Work.  EPA will notify Settling Defendants in writing (which writing may be electronic) if EPA determines that implementation of a Work Takeover by EPA is warranted under this Paragraph 89b(1).  Notwithstanding Settling Defendants' invocation of dispute resolution pursuant to this Paragraph, and during the pendency of any such dispute, EPA may, in its sole discretion, commence and continue performance of a Work Takeover under this Paragraph 89b(1) until the earlier of (1) the date that the Primary Settling Defendant remedies, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, or (2) the date that a final decision is rendered in accordance with Paragraph 70 (Record Review) requiring EPA to terminate such Work Takeover; or

(2)    direct the Secondary Settling Defendants in writing, jointly and severally, to complete all or any portion(s), as EPA deems necessary, of Primary Settling Defendant's  remaining obligations under the Consent Decree. Secondary Settling Defendants shall thereafter jointly and severally perform such obligations and may obtain reimbursement from the Standby Remedial Trust Account into which the appropriate financial assurance funds shall have been placed to the extent available; provided that, should Secondary Settling Defendants timely invoke the procedures set forth in Paragraph 70 (Record Review), to dispute all or any portion of Work Takeover under this Paragraph, EPA shall only direct such actions following

completion of a consolidated dispute resolution proceeding at the EPA-level by issuance of a final administrative decision resolving the dispute by the Director of the Emergency and Remedial Response Division, EPA Region 2, in accordance with Paragraph 69.b. In the event that the Secondary Settling Defendants fail to perform their obligations, EPA may access the Standby Remedial Trust account and any other financial assurance as provided in Section XIII (Performance Guarantee).

      c.    At such time as EPA acts in accordance with either Paragraph 89.b(1) or 89.b(2), EPA shall draw down the financial assurance provided by Primary Settling Defendant and, if necessary that provided by Rio Tinto AUM and immediately: i) if acting under Paragraph 89.b(1), place the proceeds into the Pohatcong Valley Groundwater Contamination Superfund Site Special Account, or ii) if acting under Paragraph 89.b(2) and following issuance of a final administrative decision resolving any timely dispute under that subparagraph, place the proceeds into the Standby Remedial Trust Account.

      d.    In the event that EPA is unable to access financial assurance established in its favor by Primary Settling Defendant and Rio Tinto AUM, or the financial assurance funds are exhausted by performance of the Work, the Secondary Settling Defendants shall be jointly and severally liable for the remaining obligations of Primary Settling Defendant under the Consent Decree.

      90.    Notwithstanding any other provision of this Consent Decree, the United States retains all authority and reserves all rights to take any and all response actions authorized by law.

## XXII.  COVENANTS BY SETTLING DEFENDANTS

      91.    <u>Covenants by Settling Defendants</u>.  Subject to the reservations in Paragraph 93, Settling Defendants covenant not to sue and agree not to assert any claims or causes of action against the United States with respect to the Site, past response actions regarding the Site, Past Response Costs, Future Response Costs, and this Consent Decree, including, but not limited to:

      a.    any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through CERCLA Sections 106(b)(2), 107, 111, 112 or 113, or any other provision of law;

      b.    any claims under CERCLA Sections 107 or 113, RCRA Section 7002(a), 42 U.S.C. § 6972(a), or state law regarding  the Site, past response actions regarding the Site, Past Response Costs, Future Response Costs, and this Consent Decree; or

      c.    any claims arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the New Jersey Constitution, the Tucker Act, 28 U.S.C. §1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law.

      92.    Except as provided in Paragraph 102 (Res Judicata and Other Defenses), the covenants in this Section shall not apply if the United States brings a cause of action or issues an order pursuant to any of the reservations in Section XXI (Covenants by Plaintiff), other than in

Paragraphs 88.a (claims for failure to meet a requirement of the Consent Decree), 88.g (criminal liability), and 88.h (violations of federal/state law during or after implementation of the Work), but only to the extent that Settling Defendants' claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

93.     Settling Defendants reserve, and this Consent Decree is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, and brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States, as that term is defined in 28 U.S.C. § 2671, while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on EPA's selection of response actions, or the oversight or approval of Settling Defendants' plans, reports, other deliverables or activities.

94.     Nothing in this Consent Decree shall be deemed to constitute preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

95.     Claims Against De Micromis Parties.  Settling Defendants agree not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) and 113 of CERCLA) that they may have for all matters relating to the Site against any person where the person's liability to Settling Defendants with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Site was less than 110 gallons of liquid materials or 200 pounds of solid materials.

96.     The waiver in Paragraph 95 (Claims Against De Micromis Parties) shall not apply with respect to any defense, claim, or cause of action that a Settling Defendant may have against any person meeting the criteria in Paragraph 95 if such person asserts a claim or cause of action relating to the Site against such Settling Defendant.  This waiver also shall not apply to any claim or cause of action against any person meeting the criteria in Paragraph 95 if EPA determines:

a.     that such person has failed to comply with any EPA requests for information or administrative subpoenas issued pursuant to Section 104(e) or 122(e) of CERCLA, 42 U.S.C. § 9604(e) or 9622(e), or Section 3007 of RCRA, 42 U.S.C. § 6927, or has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the Site, or has been convicted of a criminal violation for the conduct to which this waiver would apply and that conviction has not been vitiated on appeal or otherwise; or

64

b.      that the materials containing hazardous substances contributed to the Site by such person have contributed significantly, or could contribute significantly, either individually or in the aggregate, to the cost of response action or natural resource restoration at the Site.

97.      Claims Against *De Minimis* and Ability to Pay Parties.  Settling Defendants agree not to assert any claims or causes of action and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) and 113 of CERCLA) that they may have for response costs relating to the Site against any person that has entered or in the future enters into a final CERCLA Section 122(g) *de minimis* settlement, or a final settlement based on limited ability to pay with EPA with respect to the Site.  This waiver shall not apply with respect to any defense, claim, or cause of action that a Settling Defendant may have against any person if such person asserts a claim or cause of action relating to the Site against such Settling Defendant.

## XXIII. EFFECT OF SETTLEMENT; CONTRIBUTION

98.      Except as provided in Paragraph 97 (Claims Against *De Minimis* and Ability to Pay Parties), nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree.  Except as provided in Paragraph 97 (Claims Against *De Minimis* and Ability to Pay Parties), each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action that each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto.  Nothing in this Consent Decree diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

99.      The Parties agree, and by entering this Consent Decree this Court finds, that this Consent Decree constitutes a judicially approved settlement for purposes of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and that each Settling Defendant is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for "matters addressed" in this Consent Decree.  The "matters addressed" in this Consent Decree are the Work, Past Response Costs, and Future Response Costs.

100.      Each Settling Defendant shall, with respect to any suit or claim brought by it for matters related to this Consent Decree, notify the United States in writing no later than 60 days prior to the initiation of such suit or claim.

101.      Each Settling Defendant shall, with respect to any suit or claim brought against it for matters related to this Consent Decree, notify in writing the United States within ten days after service of the complaint on such Settling Defendant.  In addition, each Settling Defendant shall notify the United States  within ten days after service or receipt of any Motion for Summary Judgment and within ten days after receipt of any order from a court setting a case for trial.

102.   <u>Res Judicata and Other Defenses</u>.  In any subsequent administrative or judicial proceeding initiated by the United States  for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, Settling Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States  in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XXI (Covenants by Plaintiff).

XXIV. LIEN RELEASE

103.   This Consent Decree resolves the *in rem* claim asserted by the United States in the BMS Complaint as follows:  The United States will release the Federal Lien arising under Section 107(*l*) of CERCLA, 42 U.S.C. § 9607(*l*), perfected on the Washington Facility on or about August 3, 2009 by filing a Discharge and Release of Lien with the Clerk of Warren County, New Jersey within thirty (30) days of the last occurring of the following events: (i) EPA determination of the completion of construction of the OU1 remedy, pursuant to the OU1 SOW paragraph XII.A.2; (ii) EPA determination of the completion of construction of the OU2 remedy, pursuant to the OU2 SOW paragraph  VII.A.; or (iii) EPA determination, pursuant to an OU3 SOW, of the completion of construction of the OU3 remedy, ultimately provided for in an OU3 ROD.

XXV.  ACCESS TO INFORMATION

104.   Settling Defendants shall provide to EPA, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within their possession or control or that of their contractors or agents relating to activities at the Site or to the implementation of this Consent Decree, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work.  Settling Defendants shall also make available to EPA, for purposes of investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

105.   <u>Business Confidential and Privileged Documen</u>ts.

a.   Settling Defendants may assert business confidentiality claims covering part or all of the Records submitted to Plaintiff under this Consent Decree to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b).  Records determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B.  If no claim of confidentiality accompanies Records when they are submitted to EPA, or if EPA has notified Settling Defendants that the Records are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to Settling Defendants.

66

b.      Settling Defendants may assert that certain Records are privileged under the attorney-client privilege or any other privilege recognized by federal law. If Settling Defendants assert such a privilege in lieu of providing Records, they shall provide Plaintiff with the following: (1) the title of the Record; (2) the date of the Record; (3) the name, title, affiliation (e.g., company or firm), and address of the author of the Record; (4) the name and title of each addressee and recipient; (5) a description of the contents of the Record; and (6) the privilege asserted by Settling Defendants. If a claim of privilege applies only to a portion of a Record, the Record shall be provided to the United States in redacted form to mask the privileged portion only. Settling Defendants shall retain all Records that they claim to be privileged until the United States has had a reasonable opportunity to dispute the privilege claim and any such dispute has been resolved in the Settling Defendants' favor.

c.      No Records created or generated pursuant to the requirements of this Consent Decree shall be withheld from the United States on the grounds that they are privileged or confidential.

106.    No claim of confidentiality or privilege shall be made with respect to any data, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, or engineering data, or any other documents or information evidencing conditions at or around the Site.

## XXVI. RETENTION OF RECORDS

107.    Until ten years after Settling Defendants' receipt of EPA's notification pursuant to Paragraph 51, each Settling Defendant shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to the liability of any person under CERCLA with respect to the Site. Each Settling Defendant must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above all non-identical copies of the last draft or final version of any Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to the performance of the Work, provided, however, that each Settling Defendant (and its contractors and agents) must retain, in addition, copies of all data generated during the performance of the Work and not contained in the aforementioned Records required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

108.    At the conclusion of this record retention period, Settling Defendants shall notify the United States at least 90 days prior to the destruction of any such Records, and, upon request by the United States, Settling Defendants shall deliver any such Records to EPA. Settling Defendants may assert that certain Records are privileged under the attorney-client privilege or any other privilege recognized by federal law. If Settling Defendants assert such a privilege, they shall provide Plaintiffs with the following: (a) the title of the Record; (b) the date of the Record; (c) the name, title, affiliation (e.g., company or firm), and address of the author of the Record; (d) the name and title of each addressee and recipient; (e) a description of the subject of the Record; and (f) the privilege asserted by Settling Defendants. If a claim of privilege applies only to a portion of a Record, the Record shall be provided to the United States in redacted form to mask the privileged portion only. Settling Defendants shall retain all Records that they claim

67

to be privileged until the United States has had a reasonable opportunity to dispute the privilege claim and any such dispute has been resolved in the Settling Defendants' favor. However, no Records created or generated pursuant to the requirements of this Consent Decree shall be withheld on the grounds that they are privileged or confidential.

109.   Each Settling Defendant certifies individually that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since the earlier of notification of potential liability by the United States or the State or the filing of suit against it regarding the Site and that it has fully complied with any and all EPA requests for information regarding the Site pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927.

## XXVII.   NOTICES AND SUBMISSIONS

110.   Whenever, under the terms of this Consent Decree, written notice is required to be given or a report or other document is required to be sent by one Party to another, it shall be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other Parties in writing. All notices and submissions shall be considered effective upon receipt, unless otherwise provided. Written notice as specified in this Section shall constitute complete satisfaction of any written notice requirement of the Consent Decree with respect to the United States, EPA, the State, and Settling Defendants, respectively. Notices required to be sent to EPA, and not to the United States, under the terms of this Consent Decree should not be sent to the U.S. Department of Justice.

As to the United States:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Re: DJ # 90-11-3-09051 and 90-11-3-09051/1

As to EPA:

Director, Emergency and Remedial Response
Division
United States Environmental Protection Agency
Region 2
290 Broadway, 19th Floor
New York, New York 10007

and:

                                          New Jersey Superfund Branch
                                          Office of Regional Counsel
                                          United States Environmental Protection Agency
                                          Region 2
                                          290 Broadway, 17th Floor
                                          Attention: Attorney for Pohatcong Site


and, with regard to submissions        U.S. Environmental Protection Agency, Region 2
required in relation to the Vapor       2890 Woodbridge Avenue
Intrusion Removal Action:               Building 209 (MS-211)
                                        Edison, New Jersey 08837
                                        Attention: Washington Plant, Pohatcong Site On-
                                        Scene Coordinator.


As to the Regional Financial            Chief, Financial Management Branch
Management Officer:                     U.S. Environmental Protection Agency
                                        Region 2
                                        290 Broadway, 22nd Floor
                                        New York, New York 10007



As to Settling Defendants:

Pechiney Plastics Packaging, Inc.

       Lauren M. Piana
       Corporate Counsel
       Rio Tinto AUM Services,
       Inc.
       4700 Daybreak Parkway
       South Jordan, UT 84095
       (801) 204-2715
       Lauren.Piana@riotinto.com

       and

       Bruce White, Esq.
       Barnes & Thornburg LLP
       One North Wacker Drive,
       Suite 4400
       Chicago, IL 60606-2833
       (312) 214-4584
       Bruce.White@btlaw.com


                                   69

Albéa Americas, Inc.,
    Roy Turner
    President
    Albéa Americas, Inc.
    1209 Madison Street
    Shelbyville, TN 37160
    (931) 685-6236
    Roy.Turner@albea-group.com

    and

    Christian C. Semonsen, Esq.
    Kirkland & Ellis LLP
    655 15th Street, N.W.
    Washington, D.C. 20005
    (202) 879-5076
    csemonsen@kirkland.com

Bristol-Myers Squibb Company,

    Katherine R. Kelly, Esq.
    Vice President, Assistant
    General Counsel & Assistant
    Secretary
    Bristol-Myers Squibb
    Company
    345 Park Avenue
    New York, NY 10154
    (212) 546-4852
    katherine.kelly@bms.com

    and

    J. Richard Pooler, Jr., Esq.
    Assistant General Counsel –
    EHS
    Bristol-Myers Squibb
    Company
    6000 Thompson Road
    East Syracuse, NY 13057
    (315) 432-2774
    james.pooler@bms.com

    and

    Glen R. Stuart, Esq.

Morgan, Lewis &
Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5883
gstuart@morganlewis.com

Citigroup Inc. and MRC Holdings,
Inc.

John Preston Turner, Esq.
Associate General Counsel
Citi Litigation Service Center
300 St. Paul Place, 15th Fl.
Baltimore, MD 21202
(410) 332-3687
john.preston.turner@citi.com

and

David J. Freeman, Esq.
Gibbons P.C.
1 Pennsylvania Plaza, 37th
Floor
New York, NY 10119-3701
(212) 613-2079
dfreeman@gibbonslaw.com

Rexam Beverage Can Company.

Joshua R. Markus, Esq.
General Counsel
Rexam Inc. and Subsidiaries
8770 West Bryn Mawr,
Suite175
Chicago, IL 60631
Joshua.Markus@rexam.com

As to Rio Tinto AuM:

Lauren M. Piana
Corporate Counsel
Rio Tinto AUM Services, Inc.
4700 Daybreak Parkway
South Jordan, UT 84095
(801) 204-2715

71

Lauren.Piana@riotinto.com

and

Bruce White, Esq.
Barnes & Thornburg LLP
One North Wacker Drive,
Suite 4400
Chicago, IL 60606-2833
(312) 214-4584
Bruce.White@btlaw.com

## XXVIII.   RETENTION OF JURISDICTION

111.   This Court retains jurisdiction over both the subject matter of this Consent Decree and Settling Defendants and Rio Tinto AUM for the duration of the performance of the terms and provisions of this Consent Decree for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this Consent Decree, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XIX (Dispute Resolution).

## XXIX. APPENDICES

112.   The following appendices are attached to and incorporated into this Consent Decree:

"Appendix A" consists of the OU1 ROD and OU2 ROD.

"Appendix B" consists of the OU1 SOW, the OU2 SOW, and the 2013 Vapor Intrusion Removal Action SOW.

"Appendix C" is the description and/or map of the Site.

"Appendix D" is the draft form of Proprietary Controls.

"Appendix E" is the Schedule for OU1 Remedial Design/Remedial Action.

"Appendix F" is the performance guarantees.

"Appendix G" is the Stipulation and Order, 09-cv-05692, Docket Entry 100.

"Appendix H" is the draft Standby Trust Agreement.

"Appendix I" is a figure depicting the SEP Property.

72

## XXX.  COMMUNITY INVOLVEMENT

113.    Primary Settling Defendant shall participate in community involvement activities, as requested by EPA.  EPA will determine the appropriate role for Primary Settling Defendant. Primary Settling Defendant shall also cooperate with EPA in providing information regarding the Work to the public. As requested by EPA, Primary Settling Defendant shall participate in the preparation of such information for dissemination to the public and in public meetings that may be held or sponsored by EPA to explain activities at or relating to the Site. Costs incurred by the United States under this Section, including the costs of any technical assistance grant under Section 117(e) of CERCLA, 42 U.S.C. § 9617(e), shall be considered Future Response Costs that Primary Settling Defendant shall pay pursuant to Section XVI (Payments).

## XXXI. MODIFICATION

114.    Except as provided in Paragraphs 10.f (Modification of OU1 SOW or Related Work Plans), 11.e (Modification of OU2 SOW or Related Work Plans), 12.f (Modification of OU3 SOW or Related Work Plans), or 13.d (Modification of Vapor Intrusion SOW or Related Work Plans), material modifications to this Consent Decree, including the OU1 SOW, the OU2 SOW, the OU3 SOW, or the Vapor Intrusion SOW, shall be in writing, signed by the United States and Settling Defendants, and shall be effective upon approval by the Court.  Except as provided in Paragraphs 10.f (Modification of OU1 SOW or Related Work Plans), 11.e (Modification of OU2 SOW or Related Work Plans), 12.f (Modification of OU3 SOW or Related Work Plans), or 13.d (Modification of Vapor Intrusion SOW or Related Work Plans), non-material modifications to this Consent Decree, including the OU1 SOW, the OU2 SOW, the OU3 SOW, and the Vapor Intrusion SOW shall be in writing and shall be effective when signed by duly authorized representatives of the United States and Settling Defendants. A modification to the OU1 SOW, the OU2 SOW,  the OU3 SOW, or the Vapor Intrusion SOW shall be considered material if it fundamentally alters the basic features of the selected response action or remedy within the meaning of 40 C.F.R. § 300.435(c)(2)(ii).  Before providing its approval to any modification to the SOW, the United States will provide the State with a reasonable opportunity to review and comment on the proposed modification.

115.    Modifications (non-material or material) that do not affect the obligations of or the protections afforded to the Secondary Settling Defendants may be executed without the signatures of Secondary Settling Defendants.

116.    Nothing in this Consent Decree shall be deemed to alter the Court's power to enforce, supervise, or approve modifications to this Consent Decree.

## XXXII.     SUPPLEMENTAL ENVIRONMENTAL PROJECT

117.    In addition to Primary Settling Defendant's civil penalty payment under Section XVI, Primary Settling Defendant shall implement a land preservation and restoration Supplemental Environmental Project ("SEP"), in accordance with this Section and Appendix I. The SEP shall be completed within two (2) years after the Effective Date in accordance with the schedule set forth in Paragraph 120.  To implement the SEP, Primary Settling Defendant shall (a) cause the transfer to the Warren County Board of Chosen Freeholders of two parcels comprising

approximately 60 acres of farmland (Block 14, Lot 10, and Block 15, Lot 1, in Greenwich Township, Warren County, NJ) and the creation of a conservation and public trail easement on a third parcel (collectively, the "SEP Property") to be administered by the Warren County, New Jersey, Department of Land Preservation ("Department of Land Preservation"), (b) cause the imposition of deed restrictions, restrictive covenants, and/or conservation or recreational easements on the SEP Property consistent with the purpose of this SEP, and (c) provide for the restoration and maintenance of the SEP Property consistent with the purpose of this SEP.  The purpose of this land preservation and restoration project is to preserve two parcels of approximately 60 acres in perpetuity as open space by imposition of a deed restriction, to restore and maintain those parcels as native grasslands, and to create conservation and public trail easements and improvements on the SEP Property that mitigate future environmental degradation, while also supporting incidental recreational, cultural, health and other benefits to members of the community.

118.    Primary Settling Defendant is responsible for the satisfactory completion of the SEP in accordance with the requirements of this Consent Decree.  Primary Settling Defendant may use contractors or consultants, including the Department of Land Preservation, in planning and implementing the SEP.

119.    With regard to the SEP, Primary Settling Defendant certifies the truth and accuracy of each of the following:

a.    that all information provided to the United States in connection with the approval of the SEP is complete and accurate and that Primary Settling Defendant in good faith estimates that the cost to implement the SEP is $1,149,000 and in good faith estimates that the appraised market value of the SEP Property is between approximately $720,000 and $1,065,000;

b.    that, as of the date of executing this Consent Decree, Primary Settling Defendant is not required to perform or develop the SEP by any federal, state, or local law or regulation and is not required to perform or develop the SEP by agreement, grant, or as injunctive relief awarded in any other action in any forum;

c.    that the SEP is not a project that Primary Settling Defendant was planning or intending to construct, perform, or implement other than in settlement of the claims resolved in this Consent Decree;

d.    that Primary Settling Defendant has not received and will not receive credit for the SEP in any other enforcement action;

e.    that Primary Settling Defendant will not receive any reimbursement for any portion of the SEP from any other person; and

f.    that (i) Primary Settling Defendant is not a party to any open federal financial assistance transaction that is funding or could fund the same activity as the SEP; and (ii) Primary Settling Defendant has determined to the best of its knowledge and belief after a reasonable inquiry, there is no such open federal financial assistance transaction that is funding or could fund the same activity as the SEP and has been informed by the Department of Land

74

Preservation that it is not a party to such a transaction. For purposes of these certifications, the term "open federal financial assistance transaction" refers to a grant, cooperative agreement, loan, federally-guaranteed loan guarantee, or other mechanism for providing federal financial assistance whose performance period has not yet expired.

120.   SEP Implementation Schedule and Submittal of SEP Completion Report

a.     Within 30 days after the Effective Date of the Consent Decree, Primary Settling Defendant shall provide to the United States, for the United States' review and approval, (1) a " Project Agreement," developed in consultation with the Department of Land Preservation, which will provide for performance of the SEP; and (ii) the deed restrictions and/or easements that will be recorded against the SEP Property after acquisition.

b.     Within 30 days after receiving the United States' approval of the Project Agreement, Primary Settling Defendant shall have the Project Agreement executed.

c.     Within 12 months of the Effective Date of the Consent Decree, Primary Settling Defendant shall submit to the United States documentation evidencing the purchase of the SEP Property, including the purchase price and closing date for each parcel comprising the SEP Property.

d.     Within 24 months of the Effective Date of the Consent Decree, Primary Settling Defendant shall submit a SEP Completion Report to the United States, in accordance with Section XXVII (Notices). The SEP Completion Report shall contain the following information:

(1)   a detailed description of the SEP as implemented;

(2)   copies of the executed deed restrictions on the parcels comprising the SEP Property in substantially the form approved by the United States under Paragraph 120.a.;

(3)   a copy of the executed conservation trail easement on the SEP Property;

(4)   a description of any problems encountered in completing the SEP and the solutions thereto;

(5)   an itemized list of all eligible SEP costs expended;

(6)   certification that the SEP has been fully implemented pursuant to the provisions of this Consent Decree; and

(7)   a description of the environmental and public health benefits resulting from implementation of the SEP (with a quantification of the benefits and pollutant reductions, if feasible).

121.    EPA may, in its sole discretion, require information in addition to that described in the preceding Paragraph, in order to evaluate Primary Settling Defendant's completion report.

122.    After receiving the SEP Completion Report, the United States shall notify Primary Settling Defendant whether or not Primary Settling Defendant has satisfactorily completed the SEP.  If Primary Settling Defendant does not satisfactorily complete the SEP by the deadlines contained in this Decree, including milestones set forth in paragraph 120, Primary Settling Defendant shall be liable for stipulated penalties in accordance with Paragraph 75.  If Primary Settling Defendant fails to implement the SEP, or halts or abandons work on the SEP, or if the United States determines that the SEP has been terminated, Primary Settling Defendant shall be liable for a stipulated penalty of $1,150,000; however if the SEP Property has been acquired and transferred to the Warren County Board of Chosen Freeholders  and deed restrictions have been recorded in accordance with Paragraph 117, Primary Settling Defendant shall be liable for a stipulated penalty of $150,000 for failure to complete the remaining elements of the SEP.   Secondary Settling Defendants shall not be liable for Primary Settling Defendant's failure to implement the SEP or for payment of any stipulated penalty amount accrued in relation to the SEP that Primary Settling Defendant fails to pay.

123.    Disputes concerning the satisfactory performance of the SEP and the amount of eligible SEP costs may be resolved under Section XIX (Dispute Resolution).  No other disputes arising under this Section shall be subject to Dispute Resolution.

124.    Each submission required under this Section shall be signed by an official with knowledge of the SEP and shall bear the certification language set forth in Paragraph 13.c.

125.    Any public statement, oral or written, in print, film, or other media, made by Primary Settling Defendant or Rio Tinto AUM making reference to the SEP under this Consent Decree shall include the following language: "This project was undertaken in connection with the settlement of an enforcement action, United States v. Pechiney Plastic Packaging, 09-CV-05692 (D.N.J.), taken on behalf of the U.S. Environmental Protection Agency under the Comprehensive Environmental Response, Compensation and Liability Act."

126.    For federal income tax purposes, Primary Settling Defendant and Rio Tinto AUM agree that they will neither capitalize into inventory or basis nor deduct any costs or expenditures incurred in performing the SEP.

## XXXIII.    LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

127.    This Consent Decree shall be lodged with the Court for a period of not less than 30 days for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations that indicate that the Consent Decree is inappropriate, improper, or inadequate. Settling Defendants consent to the entry of this Consent Decree without further notice.

128.   If for any reason the Court should decline to approve this Consent Decree in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XXXIV.   SIGNATORIES/SERVICE

129.   Each undersigned representative of a Settling Defendant to this Consent Decree and Rio Tinto AUM and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind such Party to this document.

130.   Each Settling Defendant and Rio Tinto AUM agree not to oppose entry of this Consent Decree by this Court or to challenge any provision of this Consent Decree unless the United States has notified Settling Defendants in writing that it no longer supports entry of the Consent Decree.

131.   Each Settling Defendant and Rio Tinto AUM shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on behalf of that Party with respect to all matters arising under or relating to this Consent Decree. Settling Defendants agree to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons. Settling Defendants need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XXXV.   FINAL JUDGMENT

132.   This Consent Decree and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties regarding the settlement embodied in the Consent Decree.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

133.   Upon entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between and among the United States and Settling Defendants. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED THIS *10* DAY OF *Mar.*, 20*15*

Judge Peter Sheridan
United States District Judge

Signature Page for Consent Decree regarding the Pohatcong Valley Groundwater Contamination
Superfund Site

FOR THE UNITED STATES OF AMERICA:

1 / 9 / 15
Date

John C. Cruden
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C.  20530

Keith T. Tashima
Claire H. Woods
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611

79

Signature Page for Consent Decree regarding the Pohatcong Valley Groundwater Contamination Superfund Site

Dec. 8, 2014

Date

Walter E. Mugdan
Director, Emergency and Remedial Response Division
U.S. Environmental Protection Agency, Region 2
290 Broadway
New York City, NY 10007

Frances M. Zizila
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 2
290 Broadway
New York City, NY 10007

Signature Page for Consent Decree regarding the Pohatcong Valley Groundwater Contamination Superfund Site

**FOR PECHINEY PLASTIC PACKAGING, INC.**

25 Nov 2014
_____
Date

Name (print): Roy Duckett
Title: Vice President
Address: PO Box 1240
          Lugoff, SC 29078

Agent Authorized to Accept Service
on Behalf of Above-signed Party:

Name (print): Bruce White
Title: Atty - Barnes & Thornburg
Address: One N. Wacker Dr- Suite 4400
Phone: Chicago Il 60606
email: 312 214 4584
        BWhite@BTLaw.com

81

Signature Page for Consent Decree regarding the Pohatcong Valley Groundwater Contamination Superfund Site

**FOR RIO TINTO AUM**

November 25, 2014
Date

Name (print): *William J Adams*
Title: *President*
Address: *4200 Daybreak Parkway*
*South Jordan, UT 84095*

Agent Authorized to Accept Service
on Behalf of Above-signed Party:

Name (print): *BRUCE WHITE*
Title: *ATTY - BARNES & THORNBURG*
Address: *ONE N. WACKER DR. - SUITE 4400*
Phone: *Chicago IL 60606*
email: *312-214-4584*
*B WHITE @ BTLAW.COM*

Pursuant to Paragraph 2, RIO TINTO AUM signs on solely with respect to only those obligations expressly set forth in the following provisions, which particularly and expressly apply to Rio Tinto AUM, either specifically or as a "Party":  Paragraphs 1, 2, 5, 11, 40, 42, 44, 45-49, 60, 68-71, 86, 89, 98, 99, 111, 125-126, and 128-132.

82

Signature Page for Consent Decree regarding the Pohatcong Valley Groundwater Contamination Superfund Site

**FOR BRISTOL-MYERS SQUIBB COMPANY AND MYSET INVESTMENT COMPANY**

November 25, 2014
Date

Name (print): Susan Voigt
Title: Vice President, EHSS
Address: P.O. Box 4500 Princeton, NJ  08543

Agent Authorized to Accept Service on Behalf of Above-signed Party:

Name (print): GLEN STUART, ATTY
Title: MORGAN LEWIS
Address: 1701 MARKET STREET
Phone: PHILADELPHIA PA 19103-2921
email: 215 963-5000
G STUART@MorganLewis.com

Bristol-Myers Squibb Company signs on behalf of itself, and on behalf of Myset Investment Company, as set forth in Paragraph F.

83

**Signature Page for Consent Decree regarding the Pohatcong Valley Groundwater Contamination Superfund Site**

**FOR CITIGROUP INC.**

December 4, 2014
**Date**

**Name (print):** J PRESTON TURNER
**Title:** Counsel
**Address:** BALTIMORE, MD 21202

**Agent Authorized to Accept Service
on Behalf of Above-signed Party:**

**Name (print):** David J. Freeman
**Title:** Director
**Address:** One Pennsylvania Plaza, New York, NY 10119
**Phone:** 212-613-2079
**email:** DFreeman@gibbonslaw.com

84

#2162126 v1
099998-00014

**Signature Page for Consent Decree regarding the Pohatcong Valley Groundwater Contamination
Superfund Site**

**FOR MRC HOLDINGS, INC.**

December 4, 2014
**Date**

Name (print): J. PRESTON TURNER
Title: DIRECTOR/COUNSEL
Address: BALTIMORE, MD 21202

**Agent Authorized to Accept Service
on Behalf of Above-signed Party:**

Name (print):
Title:
Address:
Phone:
email:

David J. Freeman
Director
One Pennsylvania Plaza, New York, NY 10119
212-613-2079
DFreeman@gibbonslaw.com

85

#2162126 v1
099998-00014

Signature Page for Consent Decree regarding the Pohatcong Valley Groundwater Contamination Superfund Site

**FOR REXAM BEVERAGE CAN COMPANY**

 11-26-2014
Date

Name (print):        Joshua R. Markus
Title:               General Counsel
Address:             8770 W. Bryn Mawr Ave., Suite 175
                     Chicago, IL 60631

Agent Authorized to Accept Service          Name (print):   Joshua Markus
on Behalf of Above-signed Party:            Title:          General Counsel
                                            Address:        8770 W. Bryn Mawr Ave, Suite 175
                                            Phone:          Chicago IL 60631
                                            email:          773 399 3509
                                                            Joshua.Markus@Rexam.com

86

Signature Page for Consent Decree regarding the Pohatcong Valley Groundwater Contamination Superfund Site

**FOR ALBÉA AMERICAS, INC.**

11/25/14
Date

Name (print): Roy W Turner
Title: President
Address: 1209 Madison St.
Shelbyville, SN 37160

Agent Authorized to Accept Service
on Behalf of Above-signed Party:

Name (print): Christian Semonsen
Title: Kirkland & Ellis LLP
Address: 655 15th St. N.W. · Washington, D.C. 20005
Phone: 202-879-5076
email: csemonsen@kirkland.com

87

Signature Page for Consent Decree regarding the Pohatcong Valley Groundwater Contamination Superfund Site

**FOR 191 STATE HIGHWAY, ROUTE 31 NORTH, BLOCK 37, LOTS 1 AND 2, BOROUGH OF WASHINGTON, AND BLOCK 30, LOT 17, WASHINGTON TOWNSHIP, COUNTY OF WARREN, NEW JERSEY.**

11/25/14
Date

Name (print): Roy W Turner
Title: President
Address: 1200 Madison St.
Shelbyville, IN 37160

Agent Authorized to Accept Service on Behalf of Above-signed Party:

Name (print): Christian Semonsen
Title: Kirkland & Ellis LLP
Address: 655 16st. N.W. - Washington, D.C. 20006
Phone: 202-879-5076
email: csemonsen@kirkland.com

88